BOWLES, PRICE ADMINISTRATOR, *v.* WILLING-
. HAM ET AL.

No. 464. Argued January 7; 10, 1944.—Decided March 27, 1944.

504

*Mr. Paul A. Freund,* with whom *Solicitor General Fahy* and *Mr. Thomas I. Emerson* were on the brief, for appellant.

*Mr. Charles J. Bloch* for appellees.

Briefs of *amici curiae* were filed by *Messrs. Maxwell C. Katz, Otto C. Sommerich,* and *Benjamin Busch,* and by *Mr. R. H. Fryberger,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Appellee, Mrs. Willingham of Macon, Georgia, sued in a Georgia court to restrain the issuance of certain rent orders under the Emergency Price Control Act of 1942 (56 Stat. 23, 50 U. S. C. App. (Supp. II) § 901) on the ground that the orders and the statutory provisions on which they rested were unconstitutional. The state court issued, *ex parte,* a temporary injunction and a show cause order. Thereupon appellant, Administrator of the Office of Price Administration, brought this suit in the federal District Court pursuant to § 205 (a) of the Act and § 24 (1) of the Judicial Code to restrain Mrs. Willingham from further prosecution of the state proceedings and from violation of the Act, and to restrain appellee Hicks, Bibb County sheriff, from executing or attempting to execute any orders in the state proceedings. The District Court in reliance on its earlier ruling in *Payne* v. *Griffin,* 51 F. Supp. 588, dismissed the Administrator's suit on bill and answer, holding that the orders in question and the provisions of the Act on which they rested were unconstitutional. The case is here on direct appeal. 50 Stat. 752, 28 U. S. C. § 349 (a).

Sec. 2 (b) of the Act provides in part that, "Whenever in the judgment of the Administrator such action is necessary or proper in order to effectuate the purposes of this Act, he shall issue a declaration setting forth the neces-

sity for, and recommendations with reference to, the stabilization or reduction of rents for any defense-area housing accommodations within a particular defense-rental area." Pursuant to that authority the Administrator on April 28, 1942, issued a declaration designating twenty-eight areas in various parts of the country, including Macon, Georgia, as defense-rental areas. 7 Fed. Reg. 3193. That declaration stated that defense activities had resulted in increased housing rents in those areas [1] and that it was necessary and proper in order to effectuate the purposes of the Act to stabilize and reduce such rents. It also contained a recommendation pursuant to § 2 (b) that the maximum rent for housing accommodations rented on April 1, 1941, should be the rental for such accommodations on that date;[2] and that in case of accom-

---

[1] The declaration recited that the designated areas were the location of the armed forces of the United States or of war production industries, that the influx of people had caused an acute shortage of rental housing accommodations, that most of the areas were those in which builders could secure priority ratings on critical materials for residential construction, that new construction had not been sufficient to restore normal rental markets, that surveys showed low vacancy ratios for rental housing accommodations in the areas, that defense activities had resulted in substantial and widespread increases in rents affecting most of these accommodations in the areas, and that official surveys in the areas had shown a marked upward movement in the general level of residential rents.

[2] Sec. 2 (b) provides: "Whenever in the judgment of the Administrator such action is necessary or proper in order to effectuate the purposes of this Act, he shall issue a declaration setting forth the necessity for, and recommendations with reference to, the stabilization or reduction of rents for any defense-area housing accommodations within a particular defense-rental area. If within sixty days after the issuance of any such recommendations rents for any such accommodations within such defense-rental area have not in the judgment of the Administrator been stabilized or reduced by State or local regulation, or otherwise, in accordance with the recommendations, the Administrator may by regulation or order establish such maximum rent or maximum rents for such accommodations as in his judgment

modations not rented on April 1, 1941, or constructed thereafter provisions for the determination, adjustment, and modification of maximum rents should be made, such rents to be in principle no greater than the generally prevailing rents in the particular area on April 1, 1941. The declaration also stated in accordance with the provisions of § 2 (b)[3] that if within sixty days after April 28, 1942, such rents within the areas in question had not been

will be generally fair and equitable and will effectuate the purposes of this Act. So far as practicable, in establishing any maximum rent for any defense-area housing accommodations, the Administrator shall ascertain and give due consideration to the rents prevailing for such accommodations, or comparable accommodations, on or about April 1, 1941 (or if, prior or subsequent to April 1, 1941, defense activities shall have resulted or threatened to result in increases in rents for housing accommodations in such area inconsistent with the purposes of this Act, then on or about a date (not earlier than April 1, 1940), which in the judgment of the Administrator, does not reflect such increases), and he shall make adjustments for such relevant factors as he may determine and deem to be of general applicability in respect of such accommodations, including increases or decreases in property taxes and other costs. In designating defense-rental areas, in prescribing regulations and orders establishing maximum rents for such accommodations, and in selecting persons to administer such regulations and orders, the Administrator shall, to such extent as he determines to be practicable, consider any recommendations which may be made by State and local officials concerned with housing or rental conditions in any defense-rental area."

And § 2 (c) provides: "Any regulation or order under this section may be established in such form and manner, may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act. Any regulation or order under this section which establishes a maximum price or maximum rent may provide for a maximum price or maximum rent below the price or prices prevailing for the commodity or commodities, or below the rent or rents prevailing for the defense-area housing accommodations, at the time of the issuance of such regulation or order."

[3] See the provisions of § 2 (b) in note 2, *supra*.

stabilized or reduced by state or local regulation or otherwise in accordance with the Administrator's recommendation, the Administrator might fix the maximum rents.

On June 30, 1942, the Administrator issued Maximum Rent Regulation No. 26, effective July 1, 1942, establishing the maximum legal rents for housing in these defense areas, including Macon, Georgia. 7 Fed. Reg. 4905. It recited that the rentals had not been reduced or stabilized since the declaration of April 28, 1942, and that defense activities had resulted in increases in the rentals on or about April 1, 1941, but not prior to that date. The maximum rentals fixed for housing accommodations rented on April 1, 1941 were the rents obtained on that date. § 1388.1704 (a). As respects housing accommodations not rented on April 1, 1941, but rented for the first time between that date and the effective date of the regulation, July 1, 1942—the situation involved in this case—it was provided that the maximum rent should be the first rent charged after April 1, 1941. § 1388.1704 (c). But in that case it was provided that the Rent Director (designated by § 1388.1713) might order a decrease on his own initiative on the ground, among others, that the rent was higher than that generally prevailing in the area for comparable housing accommodations on April 1, 1941. § 1388.1704 (c), §1388.1705 (c) (1). By Procedural Regulation No. 3, as amended (8 Fed. Reg. 526, 1798, 3534, 5481, 14811) issued pursuant to § 201 (d) and § 203 (a) of the Act [4] provision was made that when the Rent Direc-

---

[4] Sec. 201 (d) provides: "The Administrator may, from time to time, issue such regulations and orders as he may deem necessary or proper in order to carry out the purposes and provisions of this Act."

Sec. 203 (a) provides in part: "Within a period of sixty days after the issuance of any regulation or order under section 2, or in the case of a price schedule, within a period of sixty days after the effective date thereof specified in section 206, any person subject to any provision of such regulation, order, or price schedule may, in accordance

tor proposed to take such action he should serve a notice upon the landlord involved, stating the proposed action and the grounds therefor. § 1300.207. Within 60 days of the final action of the Rent Director the landlord might file an application for review by the regional administrator for the region in which the defense-rental area office was located and then file a protest with the Administrator for review of the action of the regional office (§ 1300.209, § 1300.210); or he might proceed by protest immediately. § 1300.209, § 1300.215. As we develop more fully hereafter, the Act provides in § 203 (a) for the filing of protests with the Administrator. The machinery for a hearing on a protest and a determination of the issue by the Administrator (§ 1300.215–§ 1300.240) was designed to provide the basis of judicial review by the Emergency Court of Appeals as authorized by § 204 (a) of the Act.

In June, 1943, the Rent Director gave written notice to Mrs. Willingham that he proposed to decrease the maximum rents for three apartments owned by her, and which had not been rented on April 1, 1941, but were first rented in the summer of 1941, on the ground that the first rents for these apartments received after April 1, 1941, were in excess of those generally prevailing in the area for comparable accommodations on April 1, 1941. Mrs. Willingham filed objections to that proposed action together with supporting affidavits. The Rent Director thereupon ad-

with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections to any such provision and affidavits or other written evidence in support of such objections. At any time after the expiration of such sixty days any persons subject to any provision of such regulation, order, or price schedule may file such a protest based solely on grounds arising after the expiration of such sixty days. Statements in support of any such regulation, order, or price schedule may be received and incorporated in the transcript of the proceedings at such times and in accordance with such regulations as may be prescribed by the Administrator."

vised her that he would proceed to issue an order reducing the rents. Before that was done she filed her bill in the Georgia court. The present suit followed shortly, as we have said.

I. We are met at the outset with the question whether the District Court could in any event give the relief which the Administrator seeks in view of § 265 of the Judicial Code (36 Stat. 1162, 28 U. S. C. § 379) which provides that "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." We recently had occasion to consider the history of § 265 and the exceptions which have been engrafted on it. *Toucey* v. *New York Life Ins. Co.*, 314 U. S. 118. In that case we listed the few Acts of Congress passed since its first enactment in 1793 which operate as implied legislative amendments to it. 314 U. S. pp. 132–134. There should now be added to that list the exception created by the Emergency Price Control Act of 1942. By § 205 (a) the Administrator is given authority to seek injunctive relief in the appropriate court (including the federal district courts) against acts or practices in violation of § 4, e. g., the receipt of rent in violation of any regulation or order under § 2. Moreover, by § 204 (d) of the Act one who seeks to restrain or set aside any order of the Administrator or any provision of the Act is confined to the judicial review granted to the Emergency Court of Appeals, which was created by § 204 (c) and to this Court.[5] As

---

[5] Sec. 204 (d) provides in part: "The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation, order, or price schedule. Except as provided in this section, no

we recently held in *Lockerty* v. *Phillips,* 319 U. S. 182, 186, 187, Congress confined jurisdiction to grant equitable relief to that narrow channel and withheld such jurisdiction from every other federal and state court. Congress thus preempted jurisdiction in favor of the Emergency Court to the exclusion of state courts.[6] The rule expressed in § 265 which is designed to avoid collisions between state and federal authorities (*Toucey* v. *New York Life Ins. Co., supra*) thus does not come into play. The powers of the District Court under § 205 (a) of the Act and § 24 (1) of the Judicial Code are ample authority for that court to protect the exclusive federal jurisdiction which Congress created.

The suggestion is made that Congress could not constitutionally withhold from the courts of the States jurisdiction to entertain suits attacking the Act on constitutional grounds. But we have here a controversy which arises under the Constitution and laws of the United States and is therefore within the judicial power of the United States as defined in Art. III, § 2 of the Constitu-

---

court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision."

It should also be noted that § 204 (c) withholds from the Emergency Court power "to issue any temporary restraining order or interlocutory decree staying or restraining, in whole or in part, the effectiveness of any regulation or order issued under section 2 or any price schedule effective in accordance with the provisions of section 206."

[6] It is true that § 205 (c) gives to state and territorial courts concurrent jurisdiction of all proceedings (except criminal proceedings) under § 205 of the Act. But they embrace only enforcement suits brought by the Administrator, not suits brought to restrain or enjoin enforcement of the Act or orders or regulations thereunder.

tion. Hence Congress could determine whether the federal courts which it established should have exclusive jurisdiction of such cases or whether they should exercise that jurisdiction concurrently with the courts of the States. *Plaquemines Fruit Co.* v. *Henderson,* 170 U. S. 511, 517; *The Moses Taylor,* 4 Wall. 411, 428–430. And see *Tennessee* v. *Davis,* 100 U. S. 257; *McKay* v. *Kalyton,* 204 U. S. 458, 468–469. Under the present Act all jurisdiction has not been withheld from state courts, since they have concurrent jurisdiction over all civil enforcement suits brought by the Administrator. § 205 (c). But the authority of Congress to withhold all jurisdiction from the state courts obviously includes the power to restrict the occasions when that jurisdiction may be invoked.

II. The question of the constitutionality of the rent control provisions of the Act [7] raises issues related to those considered in *Yakus* v. *United States, ante,* p. 414.

When it came to rents Congress pursued the policy it adopted respecting commodity prices. It established standards for administrative action and left with the Administrator the decision when the rent controls of the Act should be invoked. He is empowered to fix maximum rents for housing accommodations in any defense-rental area,[8] whenever in his judgment that action is necessary or proper in order to effectuate the purposes of the Act. A defense-rental area is any area "designated by the Administrator as an area where defense activities have re-

---

[7] Here as in *Yakus* v. *United States, supra,* the Administrator concedes that in an enforcement suit the constitutionality of the Act as distinguished from the constitutionality of orders or regulations under the Act is open. As pointed out in the *Yakus* case, reliance is placed on § 204 (d), *supra* note 5. And see S. Rep. No. 931, 77th Cong., 2d Sess., pp. 24–25.

[8] The terms rent, defense-rental area, defense-area housing accommodations, and housing accommodations are defined in § 302 of the Act.

sulted or threaten to result in an increase in the rents for housing accommodations inconsistent with the purposes" of the Act. § 302 (d). The controls adopted by Congress were thought necessary "in the interest of the national defense and security" and for the "effective prosecution of the present war." § 1 (a). They have as their aim the effective protection of our price structures against the forces of disorganization and the pressures created by war and its attendant activities.[9] § 1 (a); S. Rep. No. 931, 77th Cong., 2d Sess., pp. 1–5. Thus the policy of the Act is clear. The maximum rents fixed by the Administrator are those which "in his judgment" will be "generally fair and equitable and will effectuate the purposes of this Act." § 2 (b). But Congress did not leave the Administrator with that general standard; it supplied criteria for its application by stating that so far as practicable the Administrator in establishing any maximum rent

---

[9] Sec. 1 (a) provides in part: "It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in section 3; and to permit voluntary cooperation between the Government and producers, processors, and others to accomplish the aforesaid purposes."

should ascertain and give consideration to the rents prevailing for the accommodations, or comparable ones, on April 1, 1941. The Administrator, however, may choose an earlier or later date if defense activities have caused increased rents prior or subsequent to April 1, 1941. But in no event may the Administrator select a date earlier than April 1, 1940. And in determining a maximum rent "he shall make adjustments for such relevant factors as he may determine and deem to be of general applicability in respect of such accommodations, including increases or decreases in property taxes and other costs." § 2 (b). And Congress has provided that the Administrator "may provide for such adjustments and reasonable exceptions" as in his judgment are "necessary or proper in order to effectuate the purposes of this Act." § 2 (c).

The considerations which support the delegation of authority under this Act over commodity prices (*Yakus* v. *United States*) are equally applicable here. The power to legislate which the Constitution says "shall be vested" in Congress (Art. I, § 1) has not been granted to the Administrator. Congress in § 1 (a) of the Act has made clear its policy of waging war on inflation. In § 2 (b) it has defined the circumstances when its announced policy is to be declared operative and the method by which it is to be effectuated. Those steps constitute the performance of the legislative function in the constitutional sense. *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 144.

There is no grant of unbridled administrative discretion as appellee argues. Congress has not told the Administrator to fix rents whenever and wherever he might like and at whatever levels he pleases. Congress has directed that maximum rents be fixed in those areas where defense activities have resulted or threaten to result in increased rentals inconsistent with the purpose of the Act. And it has supplied the standard and the base period to guide the Administrator in determining what the maximum rentals should

be in a given area. The criteria to guide the Administrator are certainly not more vague than the standards governing the determination by the Secretary of Agriculture in *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 576–577, of marketing areas and minimum prices for milk. The question of how far Congress should go in filling in the details of the standards which its administrative agency is to apply raises large issues of policy. *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 398. We recently stated in connection with this problem of delegation, "The Constitution, viewed as a continuously operative charter of government, is not to be interpreted as demanding the impossible or the impracticable." *Opp Cotton Mills* v. *Administrator, supra,* p. 145. In terms of hard-headed practicalities Congress frequently could not perform its functions if it were required to make an appraisal of the myriad of facts applicable to varying situations, area by area throughout the land, and then to determine in each case what should be done. Congress does not abdicate its functions when it describes what job must be done, who must do it, and what is the scope of his authority. In our complex economy that indeed is frequently the only way in which the legislative process can go forward. Whether a particular grant of authority to an officer or agency is wise or unwise, raises questions which are none of our concern. Our inquiry ends with the constitutional issue. Congress here has specified the basic conclusions of fact upon the ascertainment of which by the Administrator its statutory command is to become effective. But that is not all. The Administrator on the denial of protests must inform the protestant of the "grounds upon which" the decision is based and of any "economic data and other facts of which the Administrator has taken official notice." § 203 (a). These materials and the grounds for decision which they furnished are included in the transcript on which judicial review is based. § 204 (a). We fail to see how more

could be required (*Taylor* v. *Brown,* 137 F. 2d 654, 658–659) unless we were to say that Congress rather than the Administrator should determine the exact rentals which Mrs. Willingham might exact.

As we have pointed out and as more fully developed in *Yakus* v. *United States, supra,* § 203 (a) of the Act provides for the filing of a protest with the Administrator against any regulation or order under § 2. Moreover, any person "aggrieved" may secure judicial review of the action of the Administrator in the Emergency Court of Appeals. § 204 (a). And that review is on a transcript which includes "a statement setting forth, so far as practicable, the economic data and other facts of which the Administrator has taken official notice." § 204 (a). Here, as in the *Yakus* case, the standards prescribed by the Act are adequate for the judicial review which has been accorded. The fact that there is a zone for the exercise of discretion by the Administrator is no more fatal here than in other situations where Congress has prescribed the general standard and has left to an administrative agency the determination of the precise situations to which the provisions of the Act will be applied and the weight to be accorded various statutory criteria on given facts. *Opp Cotton Mills* v. *Administrator, supra; Yakus* v. *United States, supra.*

Thus so far as delegation of authority is concerned, the rent control provisions of the Act, like the price control provisions (*Yakus* v. *United States, supra*), meet the requirements which this Court has previously held to be adequate for peacetime legislation.

III. It is said, however, that § 2 (b) of the Act is unconstitutional because it requires the Administrator to fix maximum rents which are "generally fair and equitable." The argument is that a rental which is "generally fair and equitable" may be most unfair and inequitable as applied to a particular landlord and that a statute which does not

provide for a fair rental to each landlord is unconstitutional. During the first World War the statute for the control of rents in the District of Columbia provided machinery for securing to a landlord a reasonable rental. *Block* v. *Hirsh,* 256 U. S. 135, 157. And see *Edgar A. Levy Leasing Co.* v. *Siegel,* 258 U. S. 242. And under other price-fixing statutes such as the Natural Gas Act of 1938 (52 Stat. 821, 15 U. S. C. § 717) Congress has provided for the fixing of rates which are just and reasonable in their application to particular persons or companies. *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591. Congress departed from that pattern when it came to the present Act. It has been pointed out that any attempt to fix rents, landlord by landlord, as in the fashion of utility rates, would have been quite impossible. *Wilson* v. *Brown,* 137 F. 2d 348, 352–354. Such considerations of feasibility and practicality are certainly germane to the constitutional issue. *Jacob Ruppert* v. *Caffey,* 251 U. S. 264, 299; *Opp Cotton Mills* v. *Administrator, supra,* p. 145. Moreover, there would be no constitutional objection if Congress as a war emergency measure had itself fixed the maximum rents in these areas. We are not dealing here with a situation which involves a "taking" of property. *Wilson* v. *Brown, supra.* By § 4 (d) of the Act it is provided that "nothing in this Act shall be construed to require any person to sell any commodity or to offer any accommodations for rent." There is no requirement that the apartments in question be used for purposes which bring them under the Act. Of course, price control, the same as other forms of regulation, may reduce the value of the property regulated. But, as we have pointed out in the *Hope Natural Gas Co.* case (320 U. S. p. 601), that does not mean that the regulation is unconstitutional. Mr. Justice Holmes, speaking for the Court, stated in *Block* v. *Hirsh, supra,* p. 155: "The fact that tangible property is also visible tends to give a rigidity

to our conception of our rights in it that we do not attach to others less concretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay." A member of the class which is regulated may suffer economic losses not shared by others. His property may lose utility and depreciate in value as a consequence of regulation. But that has never been a barrier to the exercise of the police power. *L'Hote* v. *New Orleans,* 177 U. S. 587, 598; *Welch* v. *Swasey,* 214 U. S. 91; *Hebe Co.* v. *Shaw,* 248 U. S. 297; *Pierce Oil Corp.* v. *City of Hope,* 248 U. S. 498; *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 157; *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365; *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379. And the restraints imposed on the national government in this regard by the Fifth Amendment are no greater than those imposed on the States by the Fourteenth. *Hamilton* v. *Kentucky Distilleries Co., supra; United States* v. *Darby,* 312 U. S. 100.

It is implicit in cases such as *Nebbia* v. *New York,* 291 U. S. 502, which involved the power of New York to fix the minimum and maximum prices of milk, and *Sunshine Anthracite Coal Co.* v. *Adkins, supra,* which involved the power of the Bituminous Coal Commission to fix minimum and maximum prices of bituminous coal, that high cost operators may be more seriously affected by price control than others. But it has never been thought that price-fixing, otherwise valid, was improper because it was on a class rather than an individual basis. Indeed, the decision in *Munn* v. *Illinois,* 94 U. S. 113, the pioneer case in this Court, involved a legislative schedule of maximum prices for a defined class of warehouses and was sustained

on that basis. We need not determine what constitutional limits there are to price-fixing legislation. Congress was dealing here with conditions created by activites resulting from a great war effort. *Yakus* v. *United States, supra.* A nation which can demand the lives of its men and women in the waging of that war is under no constitutional necessity of providing a system of price control on the domestic front which will assure each landlord a "fair return" on his property.

IV. It is finally suggested that the Act violates the Fifth Amendment because it makes no provision for a hearing to landlords before the order or regulation fixing rents becomes effective. Obviously, Congress would have been under no necessity to give notice and provide a hearing before it acted, had it decided to fix rents on a national basis the same as it did for the District of Columbia. See 55 Stat. 788. We agree with the Emergency Court of Appeals (*Avant* v. *Bowles,* 139 F. 2d 702) that Congress need not make that requirement when it delegates the task to an administrative agency. In *Bi-Metallic Investment Co.* v. *State Board,* 239 U. S. 441, a suit was brought by a taxpayer and landowner to enjoin a Colorado Board from putting in effect an order which increased the valuation of all taxable property in Denver 40 per cent. Such action, it was alleged, violated the Fourteenth Amendment as the plaintiff was given no opportunity to be heard. Mr. Justice Holmes, speaking for the Court, stated, p. 445: "Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power,

immediate or remote, over those who make the rule." We need not go so far in the present case. Here Congress has provided for judicial review of the Administrator's action. To be sure, that review comes after the order has been promulgated; and no provision for a stay is made. But as we have held in *Yakus* v. *United States, supra,* that review satisfies the requirements of due process. As stated by Mr. Justice Brandeis for a unanimous Court in *Phillips* v. *Commissioner,* 283 U. S. 589, 596–597: "Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate. *Springer* v. *United States,* 102 U. S. 586, 593; *Scottish Union & National Ins. Co.* v. *Bowland,* 196 U. S. 611, 631. Delay in the judicial determination of property rights is not uncommon where it is essential that governmental needs be immediately satisfied."

Language in the cases that due process requires a hearing before the administrative order becomes effective (*Morgan* v. *United States,* 304 U. S. 1, 19–20; *Opp Cotton Mills* v. *Administrator, supra,* pp. 152–153) is to be explained on two grounds. In the first place, the statutes there involved required that procedure.

Secondly, as we have held in *Yakus* v. *United States, supra,* Congress was dealing here with the exigencies of wartime conditions and the insistent demands of inflation control. Cf. *Porter* v. *Investors Syndicate,* 286 U. S. 461, 471. Congress chose not to fix rents in specified areas or on a national scale by legislative fiat. It chose a method designed to meet the needs for rent control as they might arise and to accord some leeway for adjustment within the formula which it prescribed. At the same time, the procedure which Congress adopted was selected with the view of eliminating the necessity for "lengthy and costly trials with concomitant dissipation of the time and ener-

gies of all concerned in litigation rather than in the common war effort." S. Rep. No. 931, 77th Cong., 2d Sess., p. 7. To require hearings for thousands of landlords before any rent control order could be made effective might have defeated the program of price control. Or Congress might well have thought so. National security might not be able to afford the luxuries of litigation and the long delays which preliminary hearings traditionally have entailed.

We fully recognize, as did the Court in *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426, that "even the war power does not remove constitutional limitations safeguarding essential liberties." And see *Hamilton* v. *Kentucky Distilleries Co., supra,* p. 155. But where Congress has provided for judicial review after the regulations or orders have been made effective it has done all that due process under the war emergency requires.

Other objections are raised concerning the regulations or orders fixing the rents. But these may be considered only by the Emergency Court of Appeals on the review provided by § 204. *Yakus* v. *United States, supra.*

*Reversed.*

Mr. Justice Rutledge, concurring:

I concur in the result and substantially in the Court's opinion, except for qualifications expressed below. In view of these and my difference from the Court's position in *Yakus* v. *United States, ante,* p. 414, a statement of reasons for concurrence here is appropriate.

## I.

With reference to the substantive aspects of the legislation, I would add here only the following. Since the phases in issue in this case relate to real estate rentals, it is not amiss to note that these ordinarily are within the state's power to regulate rather than that of the federal government. But their relation, both to the general

system of controlling wartime price inflation and to the special problems of housing created in particular areas by war activities, gives adequate ground for exercise of federal power over them.

Likewise, with respect to the delegation of authority to the administrator to designate "defense rental areas" and to fix maximum rentals within them, the same considerations, and others, sustain the delegation as do that to fix prices of commodities generally. The power to specify defense rental areas, rather than amounting to an excess of permissible delegation, is actually a limitation upon the administrator's authority, restricting it to regions where the facts, not merely his judgment, make control of rents necessary both to keep down inflation and to carry on the war activities concentrated in them. Accordingly, I concur fully with the Court's expressed views concerning the substantive features of the legislation.

## II.

This appeal presents two kinds of jurisdictional and procedural questions, though they are not unrelated. The first sort relate to the power of the District Court to restrain the further prosecution of the state court proceedings and the execution of, or attempts to execute, orders issued in them. The other issues relate to the District Court's power to restrain Mrs. Willingham from violating the Emergency Price Control Act and the orders issued pursuant to it affecting her interests.

As to the former, I have no doubt that the District Court had power, for the reasons stated by the Court, to restrain the prosecution of the suit in the state court and the execution of orders made by it. By § 204 (d) of the Act, Congress withheld from all courts, including the state courts, with an exception in the case of the Emergency Court of Appeals and this Court on review of its judg-

ments, "jurisdiction . . . to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision." The single exception was the power of the Emergency Court by its final judgment, or of this Court on final disposition in review thereof, § 204 (a), (b), to set aside an order or regulation. Congress clearly had the power thus to confine the equity jurisdiction of the federal courts and to make its mandate for uninterrupted operation of the rent control system effective by prohibiting the state courts so to interfere with the statutory plan, at least until it should be shown invalid by the channel created for this purpose.[1] Any effort of the state court therefore to enjoin the issuance of rent orders or suspend their operation, whether on constitutional or other grounds, was directly in the teeth of the statute's explicit provisions and a violation of its terms. By this mandate the state courts were not required to give their sanction to enforcement of an unconstitutional act or regulation or even of one which might turn out to be such. They were merely commanded to keep hands off and leave decision upon the validity of the statute or the regulations, for purposes of suspending or setting them aside, to another forum established for that purpose. Congress clearly had the power and the intent to authorize federal courts to enforce this command, by injunction if necessary.

### III.

In vesting jurisdiction in the federal district courts to enjoin violations of the Price Control Act and regulations

---

[1] *The Moses Taylor,* 4 Wall. 411; cf. *Claflin* v. *Houseman,* 93 U. S. 130, *Plaquemines Tropical Fruit Co.* v. *Henderson,* 170 U. S. 511.

issued pursuant to it, Congress included not only violations of the statute's prohibition directed to the state courts against staying enforcement but other violations as well. The District Court, acting in the exercise of that jurisdiction, rested its judgment on the decision of a question it was authorized to consider, namely, whether the Act, rather than merely a regulation issued under it, is invalid. Since the court decided that question erroneously in disposing of this case, reversal of its judgment would be required. And perhaps in strictness this is all that it would be necessary to decide at this time.

But the contention has been made earnestly all through these proceedings that the regulations, on the basis of which any injunction obtained by the administrator must rest, are invalid and beyond his authority under the Act. And the Court, relying upon the decision in the *Yakus* case, has indicated that these contentions may not be considered in a proceeding of this character.

From what already has been said, it is clear the contention misconceives the administrator's rights with respect to an injunction restraining the further prosecution of the state suit and execution of the state court's orders. His right to such an injunction may rest on considerations entirely different from those governing his right to secure an injunction restraining Mrs. Willingham from violating the regulation. The former could be founded wholly upon the power of Congress to require the state courts to keep hands entirely off, in the discharge of federal functions by federal officials, at any rate during such time as might be required for decision, with finality, upon the validity of the statute and regulations issued under it by an appropriate alternative federal method. The latter, however, presents the different question whether Congress can require the federal district courts, organized under Article III and vested by it with the judicial power, not merely to keep hands off, but by affirmative exercise

of their powers to give permanent sanction to the legislative or administrative command, notwithstanding it is or may be in conflict with some constitutional mandate.

That Congress can require the court exercising the civil jurisdiction in equity to refrain from staying statutory provisions and regulations is clear. Whether the enforcing court acts civilly or criminally, in circumstances like these, Congress can cut off its power to stay or suspend the operation of the statute or the regulation pending final decision that it is invalid. But this leaves the question whether Congress also can confer the equity jurisdiction to decree enforcement and at the same time deprive the court of power to consider the validity of the law or regulation and to govern its decree accordingly.

Different considerations, in part, determine this question from those controlling when enforcement is by criminal sanction. The constitutional limitations specially applicable to criminal trials fall to one side. Those relating to due process of law in civil proceedings, including whatever matters affecting discrimination are applicable under the Fifth Amendment, and to the independence of the judicial power under Article III, in relation to civil proceedings, remain applicable. Since in these cases the rights involved are rights of property, not of personal liberty or life as in criminal proceedings, the consequences, though serious, are not of the same moment under our system, as appears from the fact they are not secured by the same procedural protections in trial. It is in this respect perhaps that our basic law, following the common law, most clearly places the rights to life and to liberty above those of property.

All this is pertinent to whether Congress, in providing for civil enforcement of the Act and the regulations, can do what in my opinion it cannot require by way of criminal enforcement of this statute, namely, by providing the single opportunity to challenge the validity of the

regulation and making this available for the limited time, constitute the method afforded the exclusive mode for securing decision of that question and, either by virtue of the taking advantage of it or by virtue of the failure to do so within the time allowed, foreclose further opportunity for considering it.

In my opinion Congress can do this, subject however to the following limitations or reservations, which I think should be stated explicitly: (1) The order or regulation must not be invalid on its face; (2) the previous opportunity must be adequate for the purpose prescribed, in the constitutional sense; and (3), what is a corollary of the second limitation or implicit in it, the circumstances and nature of the substantive problem dealt with by the legislation must be such that they justify both the creation of the special remedy and the requirement that it be followed to the exclusion of others normally available.

In this case, in my judgment, these conditions concur to justify the procedure Congress has specified. Except for the charge that the regulations, or some of them, are so vague and indefinite as to be incapable of enforcement, there is nothing to suggest they are invalid on their face. And they clearly are not so, either in the respect specified or otherwise.[2] The proceeding by protest and appeal through the Emergency Court, even for civil consequences

---

[2] The maximum rentals established in the regulation are definite and easily enough ascertainable. Appellee's complaint against the regulation on the score of vagueness is addressed to the indefiniteness of the standards which the administrator has prescribed as a guide for his office in making decreases in maximum rentals, more particularly to § 5 (c) (1), which authorizes a decrease in the maximum if it is "higher than the rent generally prevailing in the Defense-Rental Area for comparable housing accommodations on April 1, 1941." But assuming this complaint is otherwise meritorious, the standards thus provided are no less definite than those contained in the Act itself and the contention is therefore disposed of by the determination of the constitutionality of the Act.

only, approaches the limit of adequacy in the constitutional sense, both by reason of its summary character [3] and because of the shortness of the period allowed for following it.[4]  A reservation perhaps is in order in the latter respect, when facts are discovered after the period which, if proven, would invalidate the regulation and which by reasonable diligence could not have been discovered before the period ends.  Finally, it hardly can be disputed that the substantive problem and the circumstances which created and surrounded it were such as, if ever they could be, to justify a procedure of this sort.[5]

Accordingly, I agree that, as against the challenges made here, the special remedy provided by the Act was adequate and appropriate, in the constitutional sense, for the determination of appellee's rights with civil effects, had she followed it.  And her failure to follow it produced no such irrevocable and harmful consequences, for such purposes, as would ensue if she were charged with violation as a crime.  Accordingly, by declining to take the plain way opened to her, more inconvenient though that may have been, and taking her misconceived remedy by another route, she has arrived where she might well have expected, at the wrong end.

No doubt this was due to a misconception of her rights,

---

[3] Cf. the writer's dissenting opinion in *Yakus* v. *United States, ante,* p. 460.

[4] Under the Act a protest against a regulation must be made within sixty days of its issuance, but if based on grounds arising after the sixty days, it may be filed "at any time" thereafter.

But under the Administrator's Revised Procedural Regulation No. 3, § 1300.216, "a protest against a provision of a maximum rent regulation based solely on grounds arising after the date of issuance of such maximum rent regulation shall be filed within a period of sixty days after the protestant has had, or could reasonably have had, notice of the existence of such grounds."

[5] Cf. the writer's dissenting opinion in *Yakus* v. *United States, ante,* p. 460.

both as a matter of substance and as one of procedure, due perhaps to failure to take full account of the reach of the nation's power in war. Nevertheless, the Court not improperly has set at rest some of her misconceptions concerning the effects of the regulations. Thus, it is held that the statute is not invalid in providing for maximum rents which are "generally fair and equitable." § 2 (b). It does not lessen the effect of this ruling for purposes of deciding the regulation's validity, that Maximum Rent Regulation Number 26, § 5 (c) (1), of which appellee complained on various constitutional grounds, including confiscation, provided that the administrator might order a decrease of the maximum rent for specified housing accommodations only on the ground that that rent "is higher than the rent *generally prevailing in the defense rental area* for comparable housing accommodations on April 1, 1941." (Italics added.)

Other issues raised by the appellee with respect to the regulations likewise are disposed of by the rulings upon the statute's provisions.[6] In so far as the regulations are identical with the statute, therefore, and the objections to them are identical, the disposition of these objections to the Act disposes also of those made to the regulations. In so far as the latter raised questions not raised concerning the statute, and since none of these, except as mentioned above, called attention to any feature making a regulation void on its face, the appellee has foreclosed her opportunity to assert them, as to facts existing when the suit was begun, by her failure to follow the prescribed special remedy. It is not unreasonable, in a matter of this importance and urgency, to require one, whose only valid objection to the law, including the regulations, rests in proof of facts not apparent to the administrator or the

---

[6] E. g. the contention that the regulation, like the Act, improperly delegates to the administrator and his agents "legislative" power.

court, to make his proof in the manner provided and to do so promptly, as a condition to securing equitable or other civil relief.

MR. JUSTICE ROBERTS:

I should be content if reversal of the District Court's decision were upon the ground that that court lacked power to enjoin prosecution of the appellees' state court suit. The policy expressed in § 265 of the Judicial Code applies in this instance. Moreover, if the provision of § 204 (d) of the Emergency Price Control Act is valid, the lack of jurisdiction of the state court could, and should, have been raised in that court and review of its ruling could have been obtained by established means of resort to this court. Since, however, the court has determined that the District Court acted within its competency in enjoining further prosecution of the state court suit, other issues must be faced.

The appellant in his complaint charged that the appellees threatened to disobey the provisions of the Act and the regulations made pursuant to it. The appellees answered that the Act and the regulations were void because in excess of the powers of Congress. I do not understand the Administrator to contend that the court below was precluded by the terms of the statute from passing upon the question whether the Act constitutes an unconstitutional delegation of legislative power. I am not sure whether he asserts that the provisions of § 204 (d), which purport to prohibit any court, except the Emergency Court of Appeals created by the Act, from considering the validity of any regulation or order made under the Act, prevent consideration of the Administrator's rent regulations and orders here under attack. If so, I think the contention is untenable.

The statute of its own force is not applicable in any area except the District of Columbia unless and until so

made by a regulation of the Administrator. The statutory provisions respecting rentals amount only to conference of authority on the Administrator to make regulations and do not themselves prescribe or constrain any conduct on the part of the citizen. In short, one cannot violate the provisions of the statute unless they are implemented by administrative regulations or orders. To say then that, while the court in which the Administrator seeks enforcement of the Act, and regulations made under it, has jurisdiction to pass upon the constitutionality of the Act, it may not consider the validity of pertinent regulations, is to say that the court is to consider the Act *in vacuo* and wholly apart from its application to the defendant against whom enforcement is sought. Under the uninterrupted current of authority the argument must be rejected.

This brings me to a consideration of the appellees' principal contention, namely, that, as applied to rent control, the Emergency Price Control Act is an unconstitutional delegation of legislative power to an administrative officer. In approaching this question it is hardly necessary to state the controlling principles which have been reiterated in recent decisions.[1] Congress may perform its legislative function by laying down policies and establishing standards while leaving administrative officials free to make rules within the prescribed limits and to ascertain facts to which the declared policy is to apply. But any delegation which goes beyond the application and execution of the law as declared by Congress is invalid.

Congress cannot delegate the power to make a law or refrain from making it; to determine to whom the law shall be applicable and to whom not; to determine what the law shall command and what not. Candid appraisal

---

[1] *Panama Refining Co.* v. *Ryan*, 293 U. S. 388; *Schechter Corp.* v. *United States*, 295 U. S. 495.

of the rent control provisions of the Act in question discloses that Congress has delegated the law-making power *in toto* to an administrative officer.

As already stated, the Act is not in itself effective with respect to rents. It creates an Office of Price Administration to be under the direction of a Price Administrator appointed by the President (50 U. S. C. § 921 (a)). This official is authorized, "whenever in [his] judgment . . . such action is necessary or proper in order to effectuate the purposes" of the Act, to issue a declaration setting forth the necessity for, and recommendations with reference to, the stabilization or reduction of rents for accommodations within a particular defense-rental area. If within sixty days such rents within such area have not "in the judgment of the Administrator" been stabilized or reduced in accordance with his recommendations, he may, by regulation or order, establish such maximum rent or maximum rents for such accommodations "as in his judgment will be generally fair and equitable and will effectuate the purposes" of the Act. "So far as practicable" in establishing maximum rents he is to ascertain and duly consider the rents prevailing for such accommodations, or comparable accommodations, on or about April 1, 1941 (or if, prior or subsequent to April 1, 1941, defense activities shall have resulted, or threaten to result, in increases in rents of housing accommodations in such area inconsistent with the purposes of the Act, then on or about a date (not earlier than April 1, 1940) which, "in the judgment of the Administrator" does not reflect such increases); and he shall make adjustments "for such relevant factors as he may determine and deem to be of general applicability in respect of such accommodations, including increases or decreases in property taxes and other costs." "In designating defense-rental areas, in prescribing regulations and orders establishing maximum rents for such accommodations, and in selecting

persons to administer such regulations and orders, the Administrator shall, to such extent as he determines to be practicable," consider recommendations made by State and local officials (50 U. S. C. § 902 (b)). The form and the manner of establishing a regulation or order, the insertion of classifications and differentiations, the provisions for adjustments and reasonable exceptions lie wholly "in the judgment of the Administrator" as to their necessity or propriety in order to effectuate the purposes of the Act (50 U. S. C. § 902 (c)).

The "judgment of the Administrator" as to what is necessary and proper to effectuate the purposes of the Act is the only condition precedent for his issue of an order, regulation, or prohibition affecting speculative or manipulative practices or renting or leasing practices in connection with any defense-area housing accommodations, which practices "in his judgment" are equivalent to or are likely to result in rent increases inconsistent with the purposes of the Act (50 U. S. C. § 902 (d)).

At the moment these statutory provisions were adopted rent control was not effective in any part of the nation. The Administrator was appointed for the purpose of enacting such control by regulations and orders. As will be seen, the first step he was authorized to take was to issue a declaration stating the necessity for reduction of rents within a particular defense-rental area and recommendations as to the nature of such reductions.

How is the reader of the statute to know what is meant by the term "defense-rental area"? The statutory "standard" is this:

"The term 'defense-rental area' means the District of Columbia and any area designated by the Administrator as an area where *defense activities* have resulted or *threaten* to result in an increase in the rents for housing accommodations *inconsistent with the purposes of this Act.*" (Italics supplied.) (50 U. S. C. § 942 (d).)

Save for the District of Columbia, the designation of an area where the Act is to operate depends wholly upon the Administrator's judgment that so-called defense activities have resulted or threaten to result in an increase of rents inconsistent with the purposes of the Act. Note that the judgment involved is solely that of the Administrator. He need find no facts, he need make no inquiry, he need not, unless he thinks it practicable, even consult local authorities. In exercising his judgment the Administrator must be persuaded that "defense activities" have caused or will cause a rise in rents. The statute nowhere defines or gives a hint as to what defense activities are. In time of war it is conceivable that an honest official might consider any type of work a defense activity. His judgment, however exorbitant, determines the coverage of the Act. It is true that he is authorized to make such studies and investigations as he deems necessary or proper to assist him in prescribing regulations or orders (50 U. S. C. § 922 (a)), but his unfettered judgment is conclusive whether any are necessary or proper.

But is not the Administrator's judgment channeled and confined by the final limitation that his action must be the promotion of the "purposes of this Act"? What are they? So far as material they are: "To prevent speculative, unwarranted, and abnormal increases in . . . rents" (50 U. S. C. § 901 (a)). There are other general phrases in the section which may be claimed to throw some light on the considerations the Administrator may entertain but, so far as rents are concerned, they are so vague as to be useless; as, for example, the protection of persons with relatively fixed and limited incomes, consumers, wage earners, investors and persons dependent on life insurance, annuities, and pensions from undue impairment of their standard of living, and more of the same. I have discussed these "standards" in an opinion filed in *Yakus* v. *United States, ante,* p. 448.

534

Language could not more aptly fit this grant of power than that used in *Schechter Corp.* v. *United States, supra,* at p. 551: "Here in effect is a roving commission to inquire into evils and upon discovery correct them." Equally apposite is what was said at p. 541: "It [the Act] does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, § 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction and expansion described in section one. In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered."

Placing the relevant sections of the statute together we find that the term "defense-rental area" means any area designated by the Administrator as an area where "defense activities" have resulted, or threaten to result, in "speculative, unwarranted, and abnormal increases in . . . rents." Can anyone assert that Congress has thus laid down a standard to control the action of the executive? The Administrator, and he alone, is to say what increase is speculative, what increase is unwarranted, and what increase is abnormal. What facts is he to consider? Such as he chooses. What facts did he consider in the instant case? One cannot know.

But the matter does not stop here. We have now only arrived at the designation of an area by the Administrator. As we have seen, his next step is to issue a declaration or recommendation. How shall he determine whether to do so or not? As seen by the above summary of the Act's provisions, the matter rests in the judgment of the Ad-

ministrator as to whether such action is necessary or proper to effectuate the purposes of the Act. We have just seen what those purposes are. Again, his sole and untrammeled judgment as to what is needed to prevent speculative, unwarranted or abnormal increases is the only criterion of his action. The public records show that declarations made by him merely state that, in his judgment, the basic fact exists. He makes no findings; he is not bound to make any specific inquiry; he issues a fiat. No one is to be advised as to the basis of his judgment; no one need be heard.

Does the statute afford a standard for the Administrator to follow in deciding the quantity of the reduction? Again his judgment alone is determinative. And, more, in his judgment alone rests the decision as to what accommodations within the area are to be affected by the decreed reduction. He may recommend the reduction of rent for "any accommodations" within the defense-rental area.

After the issue of his declaration and recommendations the Administrator must wait sixty days before putting his recommendations into effect. If, in his sole and unfettered judgment, stabilization has not been accomplished, he may then, by regulation or order, establish such maximum rent or maximum rents as "in his judgment" will be "generally fair and equitable and will effectuate the purposes of this Act." His order may be based upon nothing but his own opinion. It may be made without notice, without hearing, without inquiry of any sort, without consultation with local authorities. The rents established may vary from street to street, and from subdivision to subdivision, all in accordance with the Administrator's personal judgment. The order may involve classification and exemption if the Administrator, in his sole discretion, deems that this course will "effectuate the purposes of this Act." Which means, of course, if he thinks non-specula-

tion, non-abnormality, or sufficient warrant justifies the discriminations involved.

How shall he fix the amount of the maximum rent? The only standard given him is the exercise of his own judgment that the rents fixed will be "generally fair and equitable and will effectuate the purposes of this Act." "Fair and equitable" might conceivably be a workable standard if inquiry into the specific facts were prescribed and if the bearing of those facts were to be given weight in the ultimate decision, but the addition of the word "generally," and the failure to prescribe any method for arriving at what is fair and equitable leaves the Administrator such room for disregard of specific injustices and particular circumstances that no living person could demonstrate error in his conclusion. And, again, even the phrase "generally fair and equitable" is qualified by empowering the Administrator to consider also questions of speculation, unwarranted action or abnormality of condition. Such a "standard" is pretense. It is a device to allow the Administrator to do anything he sees fit without accountability to anyone.

But, it is said, this is an unfair characterization of the statute because, "so far as practicable," the Administrator must ascertain and duly consider rents prevailing for "such accommodations, or comparable accommodations, on or about April 1, 1941," and that, although he may pick out some other period which he thinks more representative, he must not select any period earlier than April 1, 1940, and, therefore, he is definitely confined and prohibited in exercising control over rentals. This argument will not do. The mere fact that he may not go to any period for comparison earlier than April 1, 1940, although he may take any later period he thinks appropriate, does not serve to obliterate the fact that after such wide and unrestricted choice of a period he can make any regulation he sees fit.

Without further elaboration it is plain that this Act creates personal government by a petty tyrant instead of government by law. Whether there shall be a law prescribing maximum rents anywhere in the United States depends solely on the Administrator's personal judgment. When that law shall take effect, how long it shall remain in force, whether it shall be modified, what territory it shall cover, whether the different areas shall be subject to different regulations, what is the nature of the activity that shall motivate the institution of the law,—all these matters are buried in the bosom of the Administrator and nowhere else.

I am far from urging that, in the present war emergency, rents and prices shall not be controlled and stabilized. But I do insist that, war or no war, there exists no necessity, and no constitutional power, for Congress' abdication of its legislative power and remission to an executive official of the function of making and repealing laws applicable to the citizens of the United States. No truer word was ever said than this court's statement in the *Minnesota Mortgage Moratorium Case* [2] that emergency does not create power but may furnish the occasion for its exercise. The Constitution no more contemplates the elimination of any of the coordinate branches of the Government during war than in peace. It will not do to say that no other method could have been adopted consonant with the legislative power of Congress. "Defense-rental areas" and "defense activities" could have been reasonably defined. Rents in those areas could have been frozen as of a given date, or reasonably precise standards could have been fixed, and administrative or other tribunals could have been given power according to the rules and standards prescribed to deal with special situations after hearing and findings and exposition of the reasons for action. I say this only be-

---

[2] *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 425, 426.

cause the argument has been made that the emergency was such that no other form of legislation would have served the end in view. It is not for this court to tell Congress what sort of legislation it shall adopt, but in this instance, when Congress seems to have abdicated and to have eliminated the legislative process from our constitutional form of Government, it must be stated that this cannot be done unless the people so command or permit by amending the fundamental law.

The obvious answer to what I have said is that this court has sustained, and no one would now question, the constitutional validity of Acts of Congress laying down purported standards as vague as those contained in the Act under consideration. But the answer is specious. Generally speaking, statutes invoking the aid of the administrative arm of the Government for their application and enforcement fall into two classes,—those in which a policy is declared and an administrative body is empowered to ascertain the facts in particular cases so as to determine whether that policy in a particular case had been violated. Of this type of legislation the Interstate Commerce Act and the Federal Trade Commission Act are classical examples. In the one, carriers are required to charge just and reasonable rates for their services. In the other, citizens are forbidden to indulge in unfair methods of competition. If it be asserted that these are but vague standards of conduct, it must at once be said that, in adopting them, Congress adopted common law concepts, the one applying to those pursuing a public calling and the other to business competitors in general, and that the standards announced carried with them concepts and contours attaching as a result of a long legal history. But more, in such instances, the standards were not to be applied in the uncontrolled judgment of the administrative body. On the contrary, the statutes require a complaint specifying the conduct thought to violate the statute and opportunity for answer, for hearing, for production of evidence, and for findings

which are subject to judicial review. With such a background for administrative procedure, what seems a loose and vague standard becomes in fact a reasonably ascertainable one that can fairly, equitably, and justly be applied.

The other and distinct class of cases is that in which Congress, as in the present instance, declares a policy and entrusts to an administrative agent, without more, the making of general rules and regulations for the implementation of that policy. These rules are, in all but name, statutes. Here, unless the rule for the guidance of the Administrator is clear, and the considerations upon which he may act are definite and certain, it must inevitably follow that, to a greater or less degree, he will make the law. No citizen can question the motive or purpose of Congress in enacting a specific statute to control and define conduct as long as Congress acts within the powers granted it by the Constitution. As has been pointed out, Congress, in passing the Emergency Price Control Act, has attempted to clothe its delegate—an Administrator—with the same unchallengeable legislative power which it possesses. In this respect the delegation is no different from that involved in the National Industrial Recovery Act which was held invalid in *Schechter Corp.* v. *United States, supra.*

We are told that "Congress has specified the basic conclusions of fact upon the ascertainment of which by the Administrator its statutory command is to become effective." This means, I take it, that the Administrator need find no facts, in the accepted sense of the expression. He need only form an opinion,—for every opinion is a conclusion of fact. And "basic" means, evidently, that his opinion is that one of the "purposes of the Act" requires the making of a law applicable to a given situation. It is not of material aid that he discloses the reasons for his action. Such a test of constitutionality was unanimously rejected in the *Schechter* case.

The statute there in question declared the policy of Congress to be "to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

Under that Act the President was required to find that the promulgation by him of a code of fair competition in any industry would "tend to effectuate the policy" of Congress as above declared. He did so find in promulgating the code there under attack.

I have already quoted what this court said with respect to the so-called standards established by the statute. That case and this fall into exactly the same category. There it was held that the President's basic conclusions of fact amounted to an exercise of his judgment as to whether a law should come into being or not. Here it is said that the Administrator's basic conclusions of fact are but the enforcement of an enactment by Congress. Whether explicitly avowed or not, the present decision overrules that in the *Schechter* case.

The judgment of the Administrator is, by this Act, substituted for the judgment of Congress. It is sought to make that judgment unquestionable just as the judg-

ment of Congress would be unquestionable once exercised and embodied in a definite statutory proscription. But Congress, under our form of Government, may not surrender its judgment as to whether there shall be a law, or what that law shall be, to any other person or body.

The Emergency Price Control Act might have been drawn so as to lay down standards for action by the Administrator which would be reasonably definite; it might have authorized inquiries and hearings by him to ascertain facts which affect specific cases within the provisions of the statute. That would have been a constitutional and practicable measure. It has done no such thing.

But it is said the Administrator's powers are not absolute, for the statute provides judicial review of his action. While the Act purports to give relief from rulings of the Administrator by appeal to the Emergency Court of Appeals and to this court, the grant of judicial review is illusory. How can any court say that the Administrator has erred in the exercise of his judgment in determining what are defense activities? How can any court pronounce that the Administrator's judgment is erroneous in defining a "defense-rental area"? What are the materials on which to review the judgment of the Administrator that one or another period in the last three years reflects, in a given area, no abnormal, speculative, or unwarranted increase in rent in particular defense housing accommodations in a chosen defense-rental area? It is manifest that it is beyond the competence of any court to convict the Administrator of error when the supposed materials for judgment are so vague and so numerous as those permitted by the statute.

One only need read the decisions of the Emergency Court of Appeals to learn how futile it is for the citizen to attempt to convict the Administrator of an abuse of judgment in framing his orders, how illusory the purported

judicial review is in fact. I have spoken more at length on this subject in my opinion in *Yakus* v. *United States,* *ante,* p. 448.

I think the judgment of the District Court was right and should be affirmed.