**BOWLES, Administrator, OPA, v. HURVITZ.**

No. 1922.

District Court, W. D. New York.

Dec. 15, 1944.

David A. White, of Buffalo, N. Y., for plaintiff.

Jacob L. Rubenstein and Samuel Levy, both of Rochester, N. Y., for defendant.

KNIGHT, District Judge.

This is a suit brought to restrain the defendant from the violation of the provisions of Revised Maximum Price Regulation No. 169, as amended, as adopted by the Price Administration pursuant to the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix § 901 et seq. Issue has been joined, and the plaintiff now makes application for an order restraining the violation of said regulation pending the trial of the suit.

Defendant is in business as a slaughterer of cattle. It is the claim of the plaintiff that between July 26, 1944, and August 26, 1944, defendant slaughtered for the Harts Food Stores, Inc. (hereinafter called Harts), retailers, located in Rochester, New York, 347 head of cattle, having a total dressed weight of 175,391 pounds, and which cattle had been purchased by Harts, and that the cost of the live animals, plus commissions and the defendant's charges for slaughtering and delivering, exceed the maximum ceiling prices of the defendant,

if Harts had purchased the dressed carcasses direct from the defendant, to the extent of $12,754.84.

It is asserted by the plaintiff that defendant violated section 1364.401, paragraph "D", of said Revised Maximum Price Regulation No. 169 in that he did not remit to Harts the difference between the total cost of live animals, commissions, charges made by the defendant, and the defendant's maximum ceiling prices for the dressed carcasses, if defendant had sold dressed carcasses to the purchaser.

Section 1364.401(d), supra, as in force as of the time in question herein, provides: "Any person who slaughters cattle or calves as a service for the purchaser of such cattle or calves shall remit to such purchaser an amount sufficient to make the cost of the dressed beef or veal carcass or of the wholesale cuts derived therefrom to such purchaser, equal to or less than the costs which would be incurred by the purchaser, if he purchased the carcass or cuts from the slaughterer at the slaughterer's maximum price therefor: * * *."

Certain exceptions are made in the aforesaid paragraph which, however, have no application here.

The price which can be paid for live stock —i. e., on the hoof—is not fixed by any statute or any regulation adopted pursuant to statute. The practical difficulty in so doing is apparent. It necessarily would have to be fixed on grades, and this would necessitate a most radical change in the method of purchase. The method employed under the government regulation is the fixation of a limitation in the price which can be charged for the various cuts of meat and processed products of meat. In custom slaughtering, such as that in which this defendant was engaged, the slaughterer either buys the animal for the purchaser's account or receives the animal after it has been purchased by the customer of the slaughterer. Maximum prices for slaughtering are fixed by the Regulation 1364.401 (d).

Included in the moving papers in the affidavit of an investigator under the office of Price Administrator is what is asserted to be a photostatic copy of a statement prepared for the investigator by the superintendent and office manager of the defendant showing the different lots of cattle slaughtered by defendant for Harts during the month of August, 1944. That statement purports to show that defendant in that period slaughtered for Harts 347 animals of the total weight of 174,391 pounds for which 941,711 points were surrendered on the basis of 5.4 points per pound.

Included, also, in said affidavit is what is asserted to be a photostatic copy of a transcript of the records of Harts, covering a period from July 26, 1944, through to August 26, 1944. This shows eight lots of cattle totaling 347 in number of pounds, and the lots in number and in total are the same as that shown on the statement to which reference has been made. As shown on the transcript of Harts' records the net cost to Harts was $51,222.36. This record also discloses the various items allowances of local charges paid by Harts to the defendant for custom slaughtering of eight lots of cattle of the total weight of 174,391 pounds. Harts' record shows the ceiling price for the various parts of the carcasses, after allowance for the by-product, was $38,467.81, and that the remittance which under the provisions of the regulation should have been made to Harts was $12,-754.55.

In an answering affidavit the defendant asserts that Harts' records as submitted in the moving papers is "inaccurate, in the opinion of deponent", but no attempt is made to show wherein it is inaccurate, other than the statement that "In the case at bar, the amount of weight realized for dressed beef is less by 16,484 of pounds than the weight found by the government conversion factor. This lesser amount would of itself result in a decrease by the sum of three thousand five hundred and forty four dollars and eight cents ($3,544.-08) being the amount required to be realized by such conversion factor." This computation is based on the statement that under regulations issued by the Price Administrator a formula was set up which provided that 61 percent of the weight of live stock would be realized for dressed beef. Assuming the accuracy of this statement, there still would be a large shortage in the remittance to Harts.

Regulation No. 169, section 1364.401, paragraph "D", makes unique and unusual provisions. The slaughterer, as in the instant case, being merely employed to slaughter and deliver the carcass, is required to pay out of his own pocket the difference between the cost of the carcass to Harts and the slaughterer's maximum ceiling price for the dressed carcass, less slaughtering charges. Not only that, but

the slaughterer is liable for treble damages for any violation of the regulation, section 205(e) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix § 925(e), since the services as slaughterer come within the meaning of "commodity" as defined in section 302 of the last-mentioned Act.

Justification for the requirements of Regulation 169, supra, is claimed to be found in the fact that this so-called "custom slaughtering" offers a processor an easy method of acquiring carcasses at costs above ceiling prices, and though he sustains a loss, he is assured of the continuance of normal volume in times of shortage and also obtains an advantage over his competitor by inviting new customers and additional trade in other lines. The regulation is said to be purposed to put custom slaughtering under the regulations comparable with that governing other beef sales. The wholesale packing industry is the usual outlet for live stock and usually the prices paid for live stock determined by the price paid the packing industry for the product, and then this in turn is determined by what customer can pay as disclosed by the demands of retailers and the quantity of stock available for slaughter.

It is claimed that custom slaughtering has assumed new proportions since the establishment of more rigid price control. The conclusion, as drawn from the papers submitted on this motion by the government, is that the government seeks to eliminate custom slaughtering because it furnishes opportunity for doing what is claimed has been done in the instant case. It does not seem to the court that it is necessary to wipe out the industry; that it can be honestly carried on to the convenience of the purchasers and their customers. However, the practice of custom slaughtering does afford opportunity to the purchaser's advantage and the disadvantage to the customer, if the regulation is not observed.

The defendant contends that there can be no violation until there has been a refusal to remit to the purchaser after the purchaser has advised the slaughterer of the amount paid for the animals and that such refusal is not alleged. Regulation 169, section 1364.401, paragraph "D" (1), states: "To enable the slaughterer to determine the amount to be remitted to the purchaser, it shall be the duty of such purchaser to advise the slaughterer of the amount paid for the cattle or calves slaughtered." This provision, while requiring the purchaser to do some act, does not excuse the slaughterer because of purchaser's failure to do such act. Responsibility rests upon the slaughterer at all times to see that the purchaser is reimbursed as required by the regulation.

Defendant in opposing this motion lays stress on the claim that the enforcement of these regulations will have a disastrous effect upon the custom slaughtering industry and points out the difficulty in meeting the provisions of these regulations. Assuming these things to be true, this court, as the defendant admits, can not pass upon the reasonableness of the regulations. They can not be challenged in this court. Section 204(d) of the Emergency Price Control Act expressly provides that the validity can be considered only in the Emergency Court of Appeals and on further appeal to the Supreme Court. Vide: Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641; Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L. Ed. 1339. Lack of jurisdiction in this court in this respect is definitely fixed.

The defendant also emphasizes the right in the court to exercise its discretion as to the granting or the denial of a temporary injunction. Hecht Co. v. United States, 321 U.S. 321, 64 S.Ct. 587, 592. Under the provisions of section 205(a) of the Emergency Price Control Act of 1942, the granting of an injunction is not mandatory, but is in the discretion of the court. The court in the Hecht case, among other things, said: "The Administrator does not carry the sole burden of the war against inflation. The courts have also been entrusted with a share of that responsibility. And their discretion under § 205(a) must be exercised in the light of the large objectives of the Act. For the standards of the public interest, not the requirements of private litigation measure the propriety and need for injunctive relief in these cases."

While the answer contains a denial that defendant has violated any of the provisions of the Revised Maximum Price Regulation No. 169, as amended, the affidavit submitted upon this motion by the defendant is largely a presentation of the difficulties found in meeting the provisions of the regulation, and in the presentation of the importance of the continued operation

4

of the defendant's slaughtering business in aid of the war effort. The defendant has not attempted to specifically deny the account of purchase and sales as disclosed in Harts' and the defendant's records. Under such a state of facts it seems that it would be an abuse of discretion if this application for a temporary injunction was denied.

The plaintiff asserts that there are questions of fact to be hereafter determined. It is not yet made clear to the court what such facts are. Upon the trial the defendant has the right to attack the records, purchases, sales and remittances as may be shown by the government, but up to this stage of the trial defendant's position in this regard is undisclosed.

While a single individual is defendant in this suit and his liability alone is involved, by reason of the nature of the suit and the public interest in the enforcement of these regulations in aid of the war effort, the effect of this action may reach far beyond the individual activities of the defendant. Under the showing here made it is not seen how this court can rightly refuse to grant a temporary injunction.

An order may be submitted in accord herewith.