**MT. AIRY REFINING CO., Peerless Petrochemicals, Inc., Shepherd Oil, Inc., Vicksburg Refining, Inc., Giant Industries, Inc., Mallard Resources, Inc., Carbonite Refinery, Inc., Plaintiffs,**

v.

**James R. SCHLESINGER, Secretary of Energy, and David J. Bardin, Administrator, Economic Regulatory Administration, Department of Energy, Defendants.**

Civ. A. No. CA 79–1366.

United States District Court, District of Columbia.

Aug. 21, 1979.

William H. Bode, William E. Reukauf, Washington, D. C., for plaintiffs.

Stephanie Lachman Golden, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

PENN, District Judge.

This comes before the Court on cross-motions for summary judgment which address plaintiffs' motion to enjoin the implementation of Department of Energy amendments to the domestic crude oil allocation plan, published on May 2, 1979 at 44 Federal Register 25621.[1]

Plaintiffs are seven individual corporations, each of which owns a crude oil refinery plant with capacity to refine no more than 15,000 barrels of crude oil per day. Under the terms of 15 U.S.C. § 752(4), these refiners are termed "small refiners". They seek to enjoin the Secretary of Energy, and the administrator of the Department of Energy's Economic Regulatory Administration from implementing the amended regulations which are intended to revise the amount of special economic benefits made available to small refiners under the domestic crude oil allocation plans "entitlements program".[2] The formula for calculating those benefits is called the small refiner bias.

In a notice of proposed rulemaking (NPRM), published November 22, 1978, at 43 Fed.Reg. 54652 (November NPRM), the

---

1. In a notice of proposed rulemaking at 43 Fed.Reg. 54659, November 22, 1978, the Administrator of the Economic Regulatory Administration of the Department of Energy determined that a regulatory analysis was required for these amendments. A draft regulatory analysis was issued on November 15, 1978. (Ad.Rec. Vol. V, p. 2825). On May 31, 1979, the Court ordered the parties to file the documents constituting the administrative record for the May regulations. Although the record was filed on June 13, 1979, neither side to this controversy brought to the Court's attention that a final regulatory analysis had not been filed with that record. On July 27, 1979, the Court entered an order requiring the defendant to file a final regulatory analysis, which was filed on July 31, 1979.

2. The general purpose of the entitlements program is to equalize the varying costs of crude oil to all refiners. Cost differentials arise because price controls limit the cost of domestic crude oil but not foreign crude oil. The program requires that refiners having access to a larger portion of cheaper oil must purchase "entitlements" to use this oil by paying cash to refiners who have a larger proportion of more expensive oil. The small refiner bias is an additional benefit to which certain small refiners are entitled, and was designed to ensure the competitive viability of small refiners in relation to larger oil refiners. See 39 Fed.Reg. 42246, December 4, 1974.

Department of Energy (DOE) published proposed rules to amend the small refiner bias based on its tentative conclusion that the bias overcompensated small refiners. The proposed amendments reduced the benefits to the level of estimated operating margin disadvantages experienced by representative small refiners of different plant sizes, changed the bias calculation to an individual plant capacity basis, and expressed the bias benefits in fixed dollar amounts. These amendments contained no formula designed to eventually phase out the bias program, although general notice of this possibility was given. The November NPRM was also accompanied by a DOE draft regulatory analysis (Ad.Rec. Vol. V, p. 2825)[3] setting forth a review of the objectives and justification, and impacts of the proposed amendments as well as a review of alternative amendments.

The final amendments were published on May 2, 1979 (May regulations). These amendments adopted the November NPRM's approach of calculating the bias on an individual plant capacity and adopted the same numerical values for the bias benefit level. The final rules did not include, however, a fixed dollar formula for setting the bias benefit levels. Instead, DOE adopted another formula designed to automatically phase out the small refiner bias in conjunction with and in direct proportion to the President's announced gradual decontrol of all domestic crude oil production by September 30, 1981.

In any injunction proceeding, the Court must first determine whether the four criteria set down in *Virginia Petroleum Jobbers Assn. v. F.P.C.*, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958) have been met. *Dendy v. Washington Hospital Center*, 189 U.S.App.D.C. 212, 581 F.2d 990 (1978); *McGuire Shaft and Tunnel Corp. v. Local Union No. 1791, UMW*, 475 F.2d 1209 (Em. App.1973) cert. denied 412 U.S. 958, 93 S.Ct.

3008, 37 L.Ed.2d 1009 (1973). The first criteria involves the plaintiffs' likelihood of success on the merits which in this case involves an assessment of the plaintiffs' four allegations that 1) the rulemaking record made prior to the issuance of the amendments was not adequate to support the May regulations and that those amendments are arbitrary and capricious in violation of the Emergency Petroleum Allocation Act of 1973, (EPAA), 15 U.S.C. § 754(a)(1)[4], 2) that the May regulations were promulgated in violation of the Department of Energy's own procedural requirements, 3) that there was a failure to submit the amendments to the Federal Energy Regulatory Council for approval and then if approved, thereafter to both Houses of Congress, and 4) that DOE failed to comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. The other three *Virginia Petroleum Jobbers* criteria involve the prospect of irreparable injury to the plaintiffs if relief is withheld, the possibility of harm to other interested parties if the relief requested is granted, and an assessment of the public interest.

Once these assessments have been made, the Court must decide whether or not the balance of equities revealed by these various factors necessitate the issuance of a preliminary injunction. In this regard, the court has noted that in *WMATC, Inc. v. Holiday Tours*, 182 U.S.App.D.C. 220, 223, 559 F.2d 841, 844 (1977), it was stated that:

> An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success.

---

**3.** The reference to the Administrative Records will be referred to as "Ad.Rec."

**4.** This section of the code incorporates by reference § 211(a), 12 U.S.C. § 1904 note which provides that an agency's regulation may be set

aside if the issuance of such regulation was in excess of the agency's authority, was arbitrary or capricious, or was otherwise unlawful under 5 U.S.C. § 706(2), the Administrative Procedure Act.

Applying this analytical framework to the instant case, the Court concludes that one section of the May regulations [5] was promulgated in violation of DOE's own procedural requirements as well as in violation of the procedural requirements of NEPA. Plaintiffs have established therefore, success on the merits with respect to this aspect of the May regulations. In addition, these procedural violations do involve irreparable harm, and the issuance of an injunction at this time with regard to this particular section of the regulations would serve both the public interest and cause little, if any, harm to other interested parties.

With regard to all other aspects of the regulations, the Court concludes that the balance of the factors involved does not make it appropriate for equitable relief to issue. These conclusions are discussed more fully below.

I

The first criteria set forth in *Virginia Petroleum Jobbers* is whether the plaintiffs have made a substantial showing of probable success on the merits. Since this case is before the Court on cross motions for summary judgment, the Court will enter a final judgment on the merits.

■ The plaintiffs have offered four substantive objections to the validity of the May regulations each of which is assessed below. The Court notes at the outset, however, that there is a judicial presumption of the validity of administrative action and that the burden of overcoming that presumption is on the plaintiffs. *Udall v. Washington, Virginia & Maryland Coach Co.*, 130 U.S.App.D.C. 171, 398 F.2d 765 (1968), cert. denied 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).

1. The plaintiffs' first objection to the May regulations is that the rulemaking record is not adequate to support the issuance of the amendments and that the regulations are arbitrary and capricious.

Plaintiffs attack the May regulations by alleging that 1) DOE misused the Gordian Report, a private study commissioned by DOE to assess the small refiner bias program,[6] 2) DOE gave inadequate consideration to the evidence concerning the issue of cross-subsidization, and 3) DOE did not adequately consider the effects of the Iranian political crisis and the Organization of Petroleum Exporting Countries (OPEC) increases in the cost of crude oil.

■ In reviewing DOE's promulgation of the May regulations, the Court must review the entire administrative record to determine whether the agency's actions have a rational basis in the evidence. *Ethyl Corporation v. Environmental Protection Agency*, 176 U.S.App.D.C. 373, 541 F.2d 1 (1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). "The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues". *Greater Boston Television Corp. v. Federal Communications Commission*, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970) cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

(i) *Misuse of the Gordian Report*

■ Plaintiffs argue that DOE primarily relied on the Gordian Report in reaching its conclusions concerning the small refiner bias levels despite warnings by the report that it should not be so used. The specific warnings cited to the Court by the plaintiffs are taken from the report itself:

Development of an appropriate policy with regard to future government assistance to small refiners involves a number of considerations. This study does not attempt to address all of these in detail. Its primary purpose is to provide an appreciation of important factors influencing refining economics. (Ad.Rec. Vol. I, p. 11). This study is principally an analysis of plant economies of scale. The results of such a study are of interest for a number of possible reasons. We do not

---

5. Published as 10 C.F.R. § 211.67(e)4 at 44 Fed.Reg. 25621, May 2, 1979.

6. See Ad.Rec., Vol. I, p. 5.

view them, however, to form the sole or even primary basis of definition of a future small refiner subsidy program. (Ad. Rec. Vol. I, p. 17.)

The Gordian Report recognized that myriad factors could be taken into account with regard to formulating the scope and extent of a subsidy program for small refiners:

> The present program operated by DOE is in response to a charge from Congress to preserve the competitive viability of small and independent refiners. This is a broad mandate that DOE can interpret in a number of ways. (Ad.Rec. Vol. I, p. 17)

The report also warned that all the different factors which could go into the formulation of a bias program were not considered therein. For example, the report stated that:

> Analysis of the extent or even existence of disadvantages arising from non-competitive conditions is beyond the scope of this study. (Ad.Rec. Vol. I, p. 17; see also Vol. I, p. 12 for further recognized limitations of the report.)

This does not mean, however, that the conclusions which the report did reach with regard to a limited number of factors formulating the small refiner bias are in any way invalid. Nor does it mean that any revision of the small refiner bias must necessarily take every conceivable factor into account. Rather than attempting a comprehensive study, the Gordian Report isolated one factor which helped dictate the bias levels and analyzed that one factor in detail:

> . . . a significant part of FEA's [Federal Energy Administration] rationale for inclusion of small refiner bias provisions in the entitlements program was to compensate for differences that were believed to exist in refining costs between large and small refiners. (Ad. Rec. Vol. I, p. 57.) (Matter in brackets this Court's.)

The limited nature of the report, therefore, does not cast doubt on its availability as support for the May regulations in as much as the regulations relied on those matters actually studied.

■ Plaintiffs also argue that the report cannot provide a rational basis because it is a computer model of the petroleum industry which is outdated and inaccurate in its treatment of the small refiner, reflecting no specific investigation of particular refineries, and consisting of inferences and projections based on partial, and unverified statistics. (Plf. Brief p. 3.)

The record reveals, however, that the method which the plaintiffs would have preferred to form the basis of bias amendments was considered by the Gordian Report and was rejected as a feasible alternative. In choosing the computer model approach, the report noted that *individual* refinery operations would differ but that the computer approach would yield satisfactory results:

> As noted in Chapter 3, a significant part of FEA's rationale for inclusion of small refiner bias provisions in the entitlements program was to compensate for differences that were believed to exist in refining costs between large and small refiners. In order to provide an appreciation of these differences, this section attempts to quantify the impact on refining costs of differences in refinery size, in refinery configuration and in types of crude run.
>
> In actual practice there is significant variation in refining costs due to differences in the specific circumstances of individual refineries. This makes systematic aggregate analysis difficult. In order to avoid such problems, and to delineate as clearly as possible the impact of differences in refinery size, type, and crude run, we have followed an approach of developing detailed cost and profitability analyses for a wide range of hypothetical operations. While none of the cases represents a specific actual operation, the majority of actual refinery operations are combinations of these cases, and we believe the estimated costs are realistic. (Ad.Rec. Vol. I, p. 57.)

While the plaintiffs might have preferred DOE to adopt a different approach, the Court cannot find that the Gordian Report's scientific method does not have a rational

basis, nor can it find that the method does not provide a rational basis for the conclusions drawn therefrom. If there are any doubts as to the existence of a rational basis for the Gordian Report approach, those are dispelled by reference to the Review of Technical Criticism of Small Refiner Bias Analysis. (Ad.Rec. Vol. III, p. 1336). As was noted by the court in *Ethyl Corp. v. Environmental Protection Agency, supra,* 176 U.S.App.D.C. at 409, 541 F.2d at 37:

> Petitioners vigorously attack both the sufficiency and the validity of the many scientific studies relied upon by the Administrator, while advancing for consideration various studies allegedly supportive of their position. . . . Evidence may be isolated that supports virtually any inference one might care to draw. Thus we might well have sustained a determination by the Administrator not to regulate lead additives on health grounds. That does not mean, however, that we cannot sustain his determination to so regulate. As we have indicated above, we need not decide whether his decision is supported by the preponderance of the evidence, nor, for that matter, whether it is supported by substantial evidence. To the contrary, we must sustain if it has a rational basis in the evidence.

In connection with the argument that the Gordian Report reflects no specific investigation of particular refineries or citation to industrywide figures, plaintiffs similarly argue that DOE wrongfully cited the Gordian Report in support of its conclusion that artificially high bias benefit levels created the proliferation of "teakettle" refineries. The agency is said to have failed to tabulate how many such operations came into existence and failed to take into account the fact that substantial numbers of small refiners do produce vital and necessary petroleum products.

The Gordian Report itself indicated the possibility of the trend of opening "teaket-

tle" refineries and cited to a March, 1977 FEA report to Congress.[7] The report concluded that:

> DOE records indicate what appears to be an unusually large number of new small refiner entrants through the route of reactivating shutdown plants or spin-offs. Since March of 1976 there have been six spin-offs of operating plants and a total of fifteen shutdown plants reactivated as new businesses. (Ad.Rec. Vol. I, p. 35)

In the November NPRM notice, it was noted that since February, 1976 twenty two small refineries had opened and that "several new small refineries have been created through the conversion of various kinds of industrial plants into refineries or through the reopening of previously inactive refineries." (Ad.Rec. Vol. V, p. 2818) In DOE's draft regulatory analysis, the growth of small refineries was documented:

> DOE's refinery certification procedures reveal that a large portion of the growth in new small companies involves plants of very simple configuration, assembled largely with used equipment. Although there are exceptions, these units are generally unable to process a variety of crude oils. . . . (Ad.Rec. Vol. V, p. 2833)

Plaintiffs, however, argue that there are no data to support this conclusion and counter it with their own examples to the contrary. In this regard, it should be noted that DOE does not deny that contrary examples exist. It merely documents the growth of particularly small inefficient refiners, which is not disproved by the existence of some new and modern small refiners. Also, aside from the figures which were published in the November NPRM, the draft regulatory analysis provided further proof of the simplistic nature of the smallest refineries:

> The analyses in Tables 13 and 14, examined in conjunction with the scale of benefits presumed in Table 12, demonstrate the extreme simplicity of refineries owned by firms in the smallest category. (Ad.Rec. Vol. V, p. 2871. See also p. 2832)

---

7. See Impact of Mandatory Petroleum Allocation Price and Other Regulations on the Profitability, Competitive Viability, and Rate of Entry of Independent Refiners and Small Refiners, March, 1977, FEA/G–77/105.

■ The administrative record reveals that the purpose of the bias level amendments was limited to address specific distortions and excesses which DOE perceived, and that the amendments were not intended to comprehensively adjust the levels of the bias to account for every aspect of a bias subsidy program or for every problem in the industry. (See Ad.Rec. Vol. V, pp. 2818, 2843–6 and 44 Fed.Reg. 25624 (1979)). To accomplish this goal, DOE adopted the Gordian Report's approach, after many comments were received concerning it, as the "most realistic and pertinent available measure of economic differentials arising from size and scope of refinery operations". (Ad.Rec. Vol. V, p. 2845). The Gordian Report recognized its own limitations, but what is crucial here is that DOE did not use the report for purposes beyond the report's limitations. The amendments are temporary and designed to address specific issues of overcompensation at some refiner size levels and the proliferation of some uneconomic plants. (Ad.Rec. Vol. V, p. 2844) The Court cannot say that DOE's use of the report to amend the regulations in this limited manner was beyond the report's intended purpose, that the report itself does not provide a rational basis for its conclusions and methodology, or that the limited revisions of the small refiner bias levels were outside the objectives of the Emergency Petroleum Allocation Act (15 U.S.C. § 751, et seq.) which is the authority under which the entitlements program was promulgated. The plaintiffs have not, therefore, carried their burden of persuasion[8] in showing that DOE's use of the Gordian Report in connection with the instant bias level revisions has been unreasonable, arbitrary or capricious.

Plaintiffs also argue that DOE misused the Gordian Report by adopting its view that the available data does not support a conclusion that there is necessarily a relationship between crude oil acquisition costs and refiner size. 44 Fed.Reg. 25624, (1979). DOE is said to have ignored substantial evidence that there are significant differences in crude oil acquisition costs for small refiners when compared to such costs for large refiners, and that the inability of the Gordian Report to find a necessary relationship between refinery size and crude oil acquisition costs cannot support a finding that there is no such relationship.

■ The record reveals that there was extensive comment on crude oil acquisition costs and this was acknowledged in both the November NPRM and the notice of the May regulations. From the very beginning of this rulemaking proceeding the Gordian Report conclusion on this subject was at issue. The report itself stated that:

. . . we view it to be difficult to draw firm conclusions with regard to any variation in the acquisition costs (for equivalent crude) that may exist as a function of company size . . . (Ad. Rec. Vol. I, p. 89) . . . In summary, we have no firm statistical bases and find it difficult to identify specific factors that would tend to give rise to significant systematic differences in the booked costs for equivalent crudes as a function of company size. (Ad.Rec. Vol. I, p. 92)

Plaintiffs point to extensive comment in the record to the contrary[9] and specifically to the Bonner and Moore Report[10] an independent study conducted by a Texas consulting firm, as contradictory of the Gordian Report's conclusions. In the final regulations, however, DOE decided not to take crude oil acquisition cost differences into account when setting the bias benefit levels, and gave the following reasons for its action:

With respect to the alleged higher crude oil acquisition costs borne by small refiners, we likewise affirm the (Gordian) report's finding that available data does not

---

8. The party which attacks the regulatory scheme bears the burden of persuasion. See page 5 above. *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391 (Em.App.1975).

9. See comments in the Ad.Rec., pp. 532, 629, 782, 1019, 1300, 2793, 2992, 3108, 3246, 3617, 3849, 4096, and 4114.

10. Ad.Rec. Vol. III, p. 1379.

support the conclusion that there is necessarily a relationship between crude oil acquisition costs and refiner size. 44 Fed. Reg. 25624.

In reviewing DOE's action in this regard, it is not up to the Court to substitute its judgment for the agency's expertise,[11] rather the Court must simply determine whether the agency's choice has a rational basis in the record. *Ethyl Corp. v. Environmental Protection Agency, supra.* On the basis of the record before the Court, it is satisfied that this issue was adequately identified, was the subject of extensive comment, that the agency identified the reason for its action, and that this reason does have a rational basis in the record.

The reason for DOE's not taking crude oil acquisition costs into account was stated in the May regulations. DOE simply did not think that the available evidence necessarily demonstrated a relationship between costs and refiner size. This conclusion was supported by reference to the Gordian Report, which itself outlined its reasoning, including a further analysis of objections to its conclusions found in the Review of Technical Criticism of Small Refiner Bias Analysis. (Ad.Rec. Vol. III, pp. 1336, 1346)

■ The Court cannot find that DOE's reliance on the Gordian Report is clearly erroneous or lacking a rational basis. At best, this can be termed a choice between two competing economic analyses. Significantly, the most important source of objection to the Gordian Report's conclusion, the Bonner and Moore Study, was itself unable to assign any special significance to crude oil acquisition cost variations between refiners of less than 10,000 b/d up to a level of 100,000 b/d. (Ad.Rec. Vol. III, p. 1470). A review of the comments submitted by interested parties also reveals that while cost differences were documented, none were related solely to differences as a function of refiner size, which was the principal concern of the bias benefit revisions. The Court, therefore, concludes that DOE's con-

sideration of this issue was neither arbitrary and capricious nor unreasonable.

(ii) *Cross-subsidization*

■ Plaintiffs argue that DOE did not give adequate consideration to the relevant factor of cross-subsidization. This activity involves the alleged downstream subsidy of major oil companies' refining operations from other profitable petroleum related activities. Plaintiffs attack as arbitrary and capricious the following DOE conclusion regarding cross-subsidization:

> Many comments urged that the bias levels should reflect other factors in addition to representative operating margin differentials, particularly the alleged cross-subsidization by the major integrated refiners of their refining activities . . . Despite numerous comments received on the cross-subsidization issue, there is no substantive data presented in the record to support these allegations. Based on the information available to date, we are unable to conclude that cross-subsidization occurs and should therefore be reflected in the bias values. 44 Fed.Reg. 25624.

The Gordian Report focused on refinery economics as a basis for setting the small refiner bias, and clearly did not attempt to assess the extent to which large integrated petroleum companies subsidized downstream operations (Ad.Rec. Vol. I, p. 12). Therefore DOE did not consider cross-subsidization when assessing small refiners' competitive disadvantages. The record reflects, however, many comments on this issue and an active debate on whether such subsidies existed.

The Bonner and Moore Study inferred the existence of cross-subsidization by noting large oil companies' high exploration and production profits compared with low refinery operations profits. (Ad.Rec. Vol. III, p. 1381 et seq.) Bonner and Moore was also cited by many individual small refiners as the basis of their cross-subsidization

---

11. *United States v. Allegheny-Lundlum Steel Corp.*, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

claims. Contrary to Bonner and Moore, however, was a report submitted by Texaco, Inc. which was compiled at the University of Michigan (Ad.Rec. Vol. VIII, at 5064). In addition, the Department of Justice directly criticized Bonner and Moore's conclusions and drew a contrary opinion on the cross-subsidization issue. (Ad.Rec. Vol. VI, p. 3152, 4019).

It is clear that cross-subsidization was squarely before DOE as an issue relevant to the rulemaking proceedings and the Court is satisfied that DOE's conclusions have a rational basis in the record.

In the notice of the May regulations, DOE noted:

> The (Department of Justice) questioned whether the major refiners subsidized their refining operations with crude oil production profits citing a lack of evidence and economic reasons that undermine this contention. 44 Fed.Reg. 25623–24, (1979).

The Department of Justice conclusions were further amplified in the record:

> In the absence of any credible explanation of why the majors would engage in such conduct, there is no reason to believe that those firms are subsidizing their refining operations. . . . The evidence offered to establish that integrated firms do in fact subsidize downstream operations is similarly unpersuasive. (Ad.Rec. Vol. VI, p. 4019; see also p. 3152–3)

It should be emphasized that DOE's conclusions and the support therefor in the record do not reflect a total rejection of the possibility of cross-subsidization but only the conclusion that at that particular time there was no substantive data in the record to justify its being taken into account when setting the bias levels. This conclusion does have a rational basis and in view of its support in the record cannot be deemed a clear error of judgment.[12]

▮▮▮▮ Plaintiffs also claim that DOE's failure to specifically address the Bonner and Moore Study in the May regulation is a further example of its arbitrary and capricious treatment of this issue. The relative importance of plaintiffs' argument can be seen by reference to *Greater Boston Television Corp. v. Federal Communications Commission, supra,* where the Court of Appeals for the District of Columbia Circuit resolved a sixteen year long battle for an FCC television station license by giving final approval to the issuance of a license. The court there reviewed the agency's action to see if it had taken a "hard look" at the salient problems and had engaged in reasoned decision making. So the determination whether the FCC acted arbitrarily and capriciously could be made, the reviewing court pointed out that "This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts. . . ." 143 U.S.App.D.C. at 393, 444 F.2d at 851. From this plaintiffs infer that Bonner and Moore should have been specifically addressed by DOE.

This standard, however, is not absolute in calling for a discussion of all the different arguments before reaching a conclusion. In *Ethyl Corp. v. Environmental Protection Agency, supra,* 176 U.S.App. D.C. at 406,

---

12. Plaintiffs argue that DOE's use of the word "likewise" in the following quotation from the May regulations "clearly demonstrates that DOE misused the Gordian Report to reach the conclusion that there is no cross-subsidization". (Plf. Brief 17):

> Based on the information available to date, we are unable to conclude that cross-subsidization occurs and should therefore be reflected in the bias values. With respect to the alleged higher cost of crude oil acquisition costs borne by small refiners, we likewise affirm the report's finding that available data does not support the conclusion that

there is necessarily a relationship between the crude oil acquisition costs and refiner size. 44 Fed.Reg. 25624.

Plaintiffs allege misuse of the Gordian Report because that report expressly declined to examine the issue of cross-subsidization. DOE's use of the word "likewise" could equally be read to imply, however, that the Gordian Report could not find substantive data on crude oil acquisition costs just as DOE had not been able to find substantive data on cross-subsidization. The use of the word "likewise", therefore, does not show clear misuse of the Gordian Report.

541 F.2d at 34, the court noted that the agency's decision would be affirmed if a rational basis exists for the agency's decision, but that the rational basis must be supplied by the agency itself, not the court. The court clarified this by further stating that a decision of less than ideal clarity will be upheld if the agency's rationale may reasonably be discerned. In essence the court must be able to satisfy itself that the major policy issues were considered in the rule-making proceeding and it must be evident as to why the agency acted as it did.

The Court finds the instant case analogous to *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974), where the Interstate Commerce Commission (ICC) gave a decision which necessarily involved the ICC's philosophy of how certain evidence which had been presented by the parties involved should have been treated. In reviewing whether or not the ICC's treatment of this evidence was arbitrary or capricious, the Supreme Court stated:

> Had the Commission responded in a more considered manner to the evidence appellees presented, review would have been greatly facilitated, and further review by this Court perhaps avoided entirely. But we can discern in the Commission's opinion a rational basis for its treatment of the evidence, and the "arbitrary and capricious" test does not require more.

Here, DOE did not directly respond to the evidence which was presented in the Bonner and Moore Study. If it had, review of this question may perhaps not have been necessary. Nevertheless, as seen above, a rational basis can be discerned for the agency's treatment of this issue. The Court also notes that in the May notice of final regulations, reference was made to the Department of Justice comments which cited a lack of evidence and economic reasons to believe that cross-subsidization was a prevalent practice. 44 Fed.Reg. 25623 (1979). In addition, DOE's analysis of cross-subsidization does not involve the reversal of a long-standing agency policy, which could arguably require a complete explanation of the agency's rationale. See *WAIT Radio v. Federal Communications Commission*, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969).

Plaintiffs further argue that DOE abused its discretion in promulgating final regulations prior to the completion of the Petroleum Marketing Practices Act Study [13] which was to examine the profitability of various segments of the petroleum industry and the extent to which subsidization is predatory and presents a threat to competition. This argument loses much of its force when put into the proper context. First, cross-subsidization had never before been considered as a factor when the small refiner bias benefit levels were set, and second, elimination of cross-subsidization was not among the limited objectives of the May regulations. Cognizant of this, DOE stated:

> There are many unresolved issues concerning appropriate long-range policy toward the domestic refining industry. The desirability of offsetting naturally occurring diseconomies of scale at all is under review by DOE and new initiatives may be developed. The purpose of the revisions now proposed is not to address these issues with a long-term program of bias benefits, but rather to improve the existing bias program by correcting the observed disparities in it during the interim when issues are under review. (Ad. Rec. Vol. V, p. 2844)

Rather than neglecting to wait for the publication of a further study, DOE acted rationally on extrapolations from the best data available to it for its limited purposes. The Court can find nothing arbitrary or capricious in this action.

(iii) *Iranian Political Crisis and OPEC Price Increases*

Plaintiffs argue that DOE failed to consider the relevant factor of the effects of the Iranian oil crisis and recent OPEC crude oil price increases. A review of the

**13.** Pub.L.No.95–297, 92 Stat. 322 (1978).

administrative record reveals, however, that this factor was considered by the agency and that DOE's ultimate treatment of this factor also had a rational basis.

The possible effects of the Iranian crisis on small refiners was put before the agency by one of the plaintiffs in the instant action, Peerless Petrochemicals, in a letter dated January 16, 1979. (Ad.Rec. Vol. V, p. 3108) Peerless' comments were echoed by other small refiners and were acknowledged by DOE when the May regulations were promulgated. DOE there stated it was not adjusting the small refiner bias in response to the situation because it considered any disruptions in the flow of crude oil temporary, and concluded that another program could take care of any resulting hardship:

. . . The current tightness in world crude oil markets due to the curtailment in exports of Iranian crude oil has created difficulties for many small refiners in obtaining access to reasonably priced crude oil. We believe that the crude oil Buy/Sell program is the appropriate regulatory mechanism to address the supply problems that small refiners are experiencing. In this regard, the ERA has assigned allocations of crude oil to many small refiners in recent months to permit them to continue operating at or near historical levels. We do not believe it is appropriate that the small refiner bias be adjusted to reflect the current, presumably temporary abnormalities in world crude oil markets.

The record reveals that the agency identified this factor and that it expressed its reasons for not calculating it into the bias benefit levels. Reference to the DOE's Evaluation of Comments Received on the Environmental Assessment amplifies the rational basis of the agency's action (Ad. Rec. Vol. XI, p. 7569).

Plaintiffs also argue that the Buy/Sell program may not be adequate, contending that certain of the plaintiffs and other new small refiners do not qualify for the program. The Court notes, however, that beyond the issue of exhausting all administrative remedies, informal rule-making will not be termed arbitrary and capricious merely because one segment of a regulated class suffers economic loss not shared by others where there is a rational basis for the rules. *Bowles v. Willingham*, 321 U.S. 503, 516–18, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Air Transport Association of America v. Federal Energy Office*, 382 F.Supp. 437 (D.DC 1974).

A total review of the plaintiffs' objections to the May regulations thus reveals that they were not arbitrary and capricious, nor were they clearly erroneous.

## II

2. The plaintiffs' second substantive attack on the May regulations is based on the argument that the regulations were promulgated in violation of the DOE's own procedural requirements, found in the Department of Energy Organization Act (DOE Act), 42 U.S.C. § 7101 et seq. In particular, that Act requires that:

§ 7191(b)(1). Notice of any proposed rule, regulation, or order described in subsection (a) of this section shall be given by publication of such proposed rule, regulation or order in the Federal Register. Such publication shall be accompanied by a statement of the research, analysis, and other available information in support of, the need for, and the probable effect of, any such proposed rule, regulation, or order.

§ 7191(c)(1). . . . If the Secretary determines that a substantial issue of fact or law exists or that such rule, regulation, or order is likely to have a substantial impact on the Nation's economy or large numbers of . . . businesses, an opportunity for oral presentation of views, data, and arguments shall be provided.

Plaintiffs argue that in order to permit meaningful comment § 7191(b)(1) requires nothing less than publication of a final formula which was previously published as a proposed rule. In this case plaintiffs argue the final formula for fixing the small refiner bias is significantly different from the November NPRM rule because a new con-

cept was inserted into the final rule's bias level calculation formula. That new concept was designed to ultimately phase out the bias benefits. This sudden substitution is said to have prevented meaningful opportunity to comment as required by law. The defendants argue that the final rule can indeed differ slightly from the proposed rule if the proposed rule encompassed the actions taken in the final rule, and that in this case the proposed rule does encompass the essential and identical provisions of the final rule.

In the November notice of proposed rulemaking, DOE published the text of an actual rule to reduce the bias benefits and published an accompanying explanation, part of which is cited below:

> In order to provide small refiners with a level of certainty with respect to bias benefits, the proposed amendments to section 211.67(e)(1) provide that the number of entitlements issuable to small refiners under the small refiner bias shall be set in fixed dollar amounts. (Ad.Rec. Vol. V, p. 2820.)

In the accompanying comments to the proposed rule, the issue of a possible phase out of bias benefits was discussed in notice form only and proposals for its accomplishment were solicited in the following manner:

> In addition, if the entitlements program is phased out, as planned, . . . we believe that under such circumstances it would be inappropriate for small refiners to receive a fixed dollar amount of entitlement benefits while the total benefits available under the program are phased out. *We solicit Particular comments as to the appropriate manner in which the small refiner bias should be phased out if the entitlements program were to be eliminated.* (Emphasis added.) (Ad.Rec. Vol. V, p. 2820.)

Aside from the issue of how the bias was to be set, in fixed amounts, fluctuating amounts, or on another basis, nothing in the proposed rule itself addressed the issue of how to best accomplish the phasing out of the bias benefits. Nor did the November

NPRM include this concern as one of the reasons for or the basis of the proposed regulations. Those reasons were limited as follows:

> . . . we have tentatively concluded that the aggregate amount of benefits received by small refiners greatly exceeds the amount necessary to preserve the viability of independent and small refiners.
> . . . Accordingly, we propose to reduce the small refiner bias to eliminate that portion of benefits which appear to be greater than the cost disadvantage of a representative refinery. Further, in order to discourage the proliferation of refineries that would otherwise be uneconomic in the absence of the small refiner bias, we propose to limit eligibility for the small refiner bias. . . . (Ad.Rec. Vol. V, p. 2818.)

The justification for the proposed regulations was underscored by the draft regulatory analysis which accompanied the November regulations but did not mention the possibility of a phase-out:

> The modifications proposed at this time are intended to reduce the observed distortions and deleterious effects of the program while maintaining a bias level sufficient to preserve the competitive viability of independent and small refiners. The proposed modifications are designed to accomplish this by (1) reducing the value of the benefits at lower crude run levels; (2) narrowing the magnitude of the differential in benefits at crude run levels of 50 MB/D and less; and (3) providing for the calculation of benefits based on individual refinery crude runs rather than on refining company aggregate crude runs. (Ad.Rec. Vol. V, p. 2830.)

In the May notice published with the final regulations, DOE noted that the President had recently announced a program to decontrol all domestic crude oil in gradual steps until full decontrol was achieved in 1981. This would have had the effect, if the small refiner bias benefit had been left on a fixed dollar basis as proposed in the November NPRM, of gradually increasing

the bias benefit to the point where it would be equal to the entire entitlements pool. DOE found this result to be "obviously contrary to the purpose of the entitlements program" and the agency took the following action in response to the planned oil decontrol in issuing the final regulations:

> We therefore affirm our tentative conclusion . . . that it would be inappropriate for small refiners to receive a fixed dollar amount of entitlement benefits while the total benefits available under the program are phased out.

> Accordingly, we are adopting amendments that will vary the value of the bias benefits in relation to the value of the runs credit. . . . we are adopting amendments to the entitlements program that will act *to automatically phase out the small refiner bias in conjunction with, and in direct proportion to the phasing out of the entitlements program.* (Emphasis added) 44 Fed.Reg. 25626 (1979).

■ Based on this sequence of events, the Court finds that DOE did not meet the procedural requirements of notice publication and oral comment[14] required by 42 U.S.C. § 7191(b)(1) and § 7191(c)(1). By including a specific formula designed to phase out the bias benefit in conjunction with progressive crude oil decontrol, DOE

added a factor not found in the proposed rule. While the final rule might be said to encompass the same provisions of the proposed rule, this extra element makes it impossible to say that the proposed rule encompassed all the provisions of the final rule. Under the circumstances of this case, therefore, the Court need not reach the issue presented by the plaintiffs that the final rule cannot differ from the previously published rule.[15] This case presents a difference of kind, not degree, between the two rules.

In *Shell v. Federal Energy Administration*, 574 F.2d 512 (Em.App.1978) the court found that the language of the Federal Energy Administration Act[16] which required publication of all proposed rules, was stricter than the usual § 4 Administrative Procedure Act language requiring only that notice be given describing either the "terms or substance of the proposed rule or a description of the subject and issues involved".[17] The court also took the occasion to address the question of how strict the FEA procedural requirements were.

This Court finds *Shell* applicable to the DOE Act because of the similarity of the language and legislative history between the DOE and FEA Acts.[18] Applying the

---

**14.** The Court notes that the parties did have an opportunity to comment orally on the general issue of a small refiner bias phase-out. There was, however, no published proposal before the parties upon which they could comment, nor was there any basis for the proposal upon which the parties could have based their own comments. Since there was no proposed rule on the phase-out issue which had been published, no effective opportunity for oral presentation could have been given. See *Shell v. Federal Energy Administration*, 574 F.2d 512, 516 (Em.App.1978).

**15.** Whether or not the final rule incorporated a fixed dollar formula as proposed in the November NPRM is not relevant to this issue. Under these circumstances, the inclusion of the fixed dollar formula is irrelevant because it was intended to address one specific purpose unrelated to the phasing out of the bias formulas.

**16.** The statutory requirements of the FEA Act, 15 U.S.C. § 766(i)(1)(B) and (C) are similar to their counterparts in the DOE Act, 42 U.S.C. § 7191(b)(1) and (c)(1). Furthermore the legis-

lative history of the DOE Act points to a similar purpose. See S.Rep.No.95–164, 95th Cong., 1st Sess. 44, 1977, U.S.Code Cong. & Admin. News, 1977, pp. 854, 898, which states that "Section 501(b) imposes additional more specific procedural requirements than found in the Administrative Procedure Act in connection with consideration by the Secretary or the Board of proposed rules." With regard to Section 501(c) the report stated "But the committee believes many rulemaking decisions which the Secretary or the Board will be making are so important to this country that oral hearings, where all interested parties have an opportunity to present their view, should be required by law, rather than merely left to agency discretion."

**17.** 5 U.S.C. § 553(b)(3).

**18.** Compare the language of § 7191(b)(1) and (c)(1) with the language of the FEA Act which states:

> § 7(i)(1)(B). Notice of any proposed rule, regulation, or order . . . shall be given

*Shell* standard, it is apparent that DOE did not meet the procedural requirements of § 7191(b)(1) and § 7191(c)(1).

In *Shell* the FEA had promulgated an interim rule on the price of unleaded gasoline and invited comments on what the final price rule for unleaded gas should be. The interim rule gave a formula fixed to the price of premium gas, but the final regulations adopted a totally different formula:

> . . . by a new and not previously announced formula, which (fixed) the price of unleaded gasoline based on the weighted average price at which leaded gasoline of the same or nearest octane number was lawfully priced . . . plus 1 cent. *Id.* at 514.

The court found that there had been no effective opportunity to comment on the formula finally adopted and that the FEA had not requested specific data reflecting differences between leaded and unleaded refining costs until after the regulation had been promulgated. These were more than mere technical deficiencies in the rulemaking procedures, but were deficiencies which had defeated the process itself.

> Congress recognized that the FEA's final judgment could only be as good as the information upon which it drew, and prescribed certain procedures—stricter than those of the "APA"—which would permit it to be educated by the most interested and therefore, hopefully, the most knowledgeable parties . . . The agency's discretion, and thus its latitude for promulgating unwise rules, was to be restrained through this deliberately prescribed process for meaningful comment . . . Here, the procedural shortcomings undermined the effectiveness of the

educational process which Congress intended the FEAA to provide for agency rulemaking. *Id.* at 516.

The court was particularly concerned with the opportunity to comment after a proposed rule had been published in the Federal Register. It first noted that the interim June rule was not the product of the careful and deliberate consideration which was necessary to permit the parties to effectively inform the agency of the wisdom of the final rule to be adopted. With regard to the final rule, it found that:

> Without sufficient notice of the proposal to be finally adopted, the parties could not comment on the wisdom of the July regulation—although this is clearly what the section contemplated by requiring stricter notice to the parties than the APA. *Id.* at 517.

While the court in *Shell* found that what had been presented for a "proposed rule" varied too greatly from the final rule to permit proper comment, it is clear, in the instant case that there was no proposed formula for the phase-out issue on which the interested parties could have based their comments, nor was there any accompanying statement of information supporting the need for and the probable effect of any such proposed rule. As in *Shell*, the November regulations in this case varied too greatly from the final May rules to satisfy the § 501(b)(1) requirements.[19]

DOE's procedure in the instant case could have had no other effect than to undermine the effectiveness of the educational process intended by the DOE Act.[20] Instead of merely adjusting the small refiner bias pursuant to the terms and stated purposes in the November NPRM and pursuant to the

by publication of such proposed rule, regulation, or order in the Federal Register. See also the legislative history of the DOE Act. S.Rep.No.95–164, 95th Cong., 1st Sess. 43, 1977, U.S.Code Cong. & Admin.News, 1977, p. 897.

**19.** It follows that if the publication requirements were not met, then there could not have been any opportunity to present oral comments pursuant to § 501(c)(1).

**20.** The five comments submitted by interested parties which were cited to the Court on the phase-out issue only serve to reflect the importance of publishing a definite proposal. Three of the comments suggested three different phaseout formulas (Ad.Rec. Vol. VI, pp. 3863, 4230 and Vol. VII, p. 4607) and two other comments suggested that some other form of subsidy program would be necessary to avoid undue hardship (Ad.Rec. Vol. V, pp. 3601, 3613).

many comments received, DOE consciously chose to include the bias phase-out formula used in the May rules as opposed to any other alternative without first exposing for discussion issues clarified by a proposed rule such as how fast and at what rate this should be done, and what might be the probable effects of such action. The small refiner bias was originally included in the entitlements program because FEA concluded that small refiners needed assistance over and above the equalized crude costs which the entitlements program was designed to bring. (See Ad.Rec. Vol. I, p. 31) In light of this fact, debate on questions concerning the manner and speed of the small refiner bias phase-out is certainly essential to the administrative process, and failure to publish a proposed rule setting forth a specific formula to accomplish this had the effect of undermining the more strict administrative procedures for rulemaking required by 42 U.S.C. § 7191(b)(1) and (c)(1).

### III

3. The plaintiffs' third argument is that the amendments to the small refiner bias are invalid because they were not submitted for review to both Houses of Congress as required by statute.[21] Plaintiffs claim that this procedure is required by the Energy Policy and Conservation Act (EPCA), P.L. 94–163, 94th Cong., 1st Sess. (1975), which amended the entitlements program promulgated pursuant to the EPAA in the following manner:

§ 403(e) Any provision of the regulation under subsection (a) of this section [providing for mandatory allocation of crude oil, residual fuel oil and refined petroleum products]—

(1) which requires the purchase of entitlements, or the payment of money through any other similar cash transfer arrangement, the purpose of which is to reduce disparities in the crude oil acquisition costs of domestic refiners, and

(2) which is based upon the number of barrels of crude oil input, or receipts, or both, of any refiner,

shall not apply to the first 50,000 barrels per day of input, or receipts, or both, of any refiner whose total refining capacity . . . did not exceed on January 1, 1975, and does not thereafter exceed 100,-000 barrels per day. 15 U.S.C. § 753(e)

Under § 455 of the EPCA, the above amendment was permitted to be changed under certain circumstances and procedures:

§ 455(g) Notwithstanding the provisions of subsection (e) of section 753 of this title, the President may, if he determines that the exemption from payments for certain small refiners required by such subsection—

(1) results in unfair economic or competitive advantage with respect to other small refiners; or

(2) otherwise has the effect of seriously impairing the President's ability to provide in the regulation under section 753(a) of this title for the attainment of the objective specified in section 753(b)(1)(D) of this title and for the attainment of those other objectives specified in section 753(b)(1) of this title; submit, in accordance with the procedures specified in section 6421 of Title 42, an amendment to modify the regulation under section 753(a) of this title with respect to the provisions of such regulation as they relate to such exemption. Such amendments shall not take effect if disapproved by either House of Congress under the procedures specified in such section 6421 of Title 42. 15 U.S.C. § 760a(g).

The FEA implemented the EPCA's § 403 statutory entitlements exemption by pro-

---

**21.** Under § 402(c)(1) of the DOE Act, 42 U.S.C. § 7172(c)(1), any proposal which must be submitted for Congressional review must first be submitted to the Federal Energy Regulatory Commission (FERC), an independent regula-

tory commission within the Department of Energy, for approval or modification. Since the Court finds that the amendments in question need not be submitted to Congress, the issue of submitting them to FERC is moot.

mulgating Special Rule No. 6.[22] Several months later, FEA sought to amend Special Rule No. 6 by revoking it and simultaneously increasing the amount of additional entitlements available to small refiners under the small refiners' bias.[23] Pursuant to the requirements of § 403, this amendment was submitted to Congress as Energy Action No. 2, and became effective when neither House of Congress disapproved it.

Plaintiffs argue that Energy Action No. 2's combined action of revoking Special Rule No. 6 and increasing the small refiner bias benefits had the effect of modifying, not revoking the EPCA's entitlements exemption since it "replaced" the revoked special rule with bias benefit increases. The entitlements exemption is thus said to "live on" under the form of increased bias benefits. From this premise, plaintiffs argue that since any change in the § 403 entitlements exemption had to be reviewed by Congress, any change in that which modified the entitlements exemption must similarly be subject to Congressional review.

■ A review of the text of the EPCA and the appropriate legislative history reveal, however, that the plaintiffs' "modification" theory is without merit in this context. The legislative history of Energy Action No. 2 shows that the FEA was not "modifying" § 403 by substituting increased small refiner bias benefits for Special Rule No. 6 and that Congress was well aware of this. Furthermore, the statutory language and legislative history of §§ 403 and 455 show that Congressional review of FEA's rules was reserved uniquely for the § 403 entitlements purchase exemption and not for any other aspect of the President's rule-making authority under the EPAA, including amendments to the small refiner bias benefits levels. The very structure of the entitlements exemption clause and its legislative history reveals that once the § 403 exemption has been itself revoked, the amendment clause requiring Congressional review has no other application.

■ Plaintiffs rely on the legislative history of Energy Action No. 2 to support their argument that the § 455 review does apply to the small refiner bias decreases. They point to FEA's testimony during Congressional hearings on the Energy Action which stated:

> Before we could change that increment to the bias (representing the previous entitlements exemption) we would have to come back to the Congress and sit through its approval of any modification to that increment. *Energy Action No. 2—Small Refiners Entitlements Hearings on S. Res. 449 and S. Res. 450.* Before the Senate Committee on Interior and Insular Affairs, 94th Cong., 2d Sess. 158 (1976).

> FEA's position as to its authority with respect to the small refiner entitlements purchase exemption is that under (the EPCA) the agency has the authority to revoke the exemption in its entirety . . . However, FEA adopted a different approach in its proposal now before Congress and chose to modify the exemption by combining the revocation of Special Rule No. 6 with an increase in the small refiner bias. As to firms that were benefiting from the exemption, FEA's position is that the amount of the increase in the bias constitutes the balance of their exemption benefits remaining after FEA's modification.[24] *Id.* at 169.

Based on this and similar testimony, plaintiffs contend that Congress relied on the FEA characterization of Energy Action No. 2's effect and that small refiner bias reductions would be submitted to Congress in the future.

A review of the floor debate on the motion to discharge Energy Action No. 2 from its respective House and Senate commit-

---

**22.** 41 Fed.Reg. 1044 (1976).

**23.** 41 Fed.Reg. 20392 (1976).

**24.** Plaintiffs have not alleged that if Special Rule No. 6 were still in force that they would be considered eligible to benefit from this exemption. Therefore even if the Court were to accept the FEA interpretation, plaintiffs have not established injury to a statutory benefit for which they were eligible.

tees, however, reveals nothing to indicate that Congress expected to review any changes in the increased small refiner bias. To the contrary, Congress knew full well that Special Rule No. 6 was being revoked in its entirety and it did not accept the FEA's "modification" terminology. Typical of the remarks in both the House and Senate is Senator Hansen's statement that "There is a legal question involved regarding the legality of revoking as opposed to modifying the small refiners exemption". 94th Cong.Rec. S8174 (1976). Several Senators and Congressmen thought Energy Action No. 2 was illegal precisely because it *revoked* Special Rule No. 6, not because it modified it. Such a record of concern hardly reflects reliance on FEA's assurance that it was not revoking the exemption but merely "modifying" it.[25]

■ The FEA's position on this issue, as presented to Congress, cannot control this Court's decision. As evidenced by the instant case, "positions" can and often do change. Nor does the FEA characterization amount to the level of a confession of error, which if it were found to exist, would likewise not bind the Court or control its decision if an independent examination lead to another result. See *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977).

The terms of the EPCA are also very specific in that the President has the power to amend the § 403 "exemption from entitlements payments for certain small refiners" and *only* that exemption:

§ 455. . . . the President may . . submit . . . an amendment to modify regulation under (§ 4a of the EPAA) with respect to the provisions of such regulation *as they relate to such exemption*. (Emphasis added)

■ When the words of a statute are this clear, they can permit no other meaning, *United States v. Hartwell*, 6 Wall. 385, 386, 18 L.Ed. 830 (1867), and here when the exemption was revoked there could be no further regulation relating to it.

This situation may be contrasted with other statutes wherein Congress generally ordered the promulgation of regulations to accomplish a certain goal and provided for Congressional review of all regulations promulgated to those ends.[26] In this kind of alternative situation, even if a specific rule is revoked the law would still demand review of any other rules promulgated in furtherance of the same objectives. In the instant case, however, the law demands review of amendments to the statutory entitlements exemption only.

The legislative history of § 455 of the EPCA similarly shows that Congress specifically intended to provide for review of amendments for the entitlements exemption only, and that the enactment of §§ 403 and 455 was not intended to authorize general Congressional review of regulations dealing with small refiners aside from the specific § 403 exemption.

The entitlements purchase exemption in § 403 originated through small refiner discontent with the entitlements program which resulted in Senator Hiram Johnston of Louisiana introducing an amendment to that program. 94th Cong.Rec. S3935, (1975). As originally submitted, the entitlements exemption made no provision for the President to amend it. In the conference between the House and Senate on the EPCA, concern was expressed that the exemption might not adequately do what it was intended to do or that it might not even be necessary.[27] Provision was thus

---

**25.** See 94 Cong.Rec. S8163–S8175, H5027–H5032, (1976), for the complete discussion concerning Energy Action No. 2 on the floor of the House and Senate.

**26.** Compare Congress' continuing review authority with regard to Presidential reorganization of the agencies of the executive branch, 5 U.S.C. §§ 901–912, and with regard to the term

of the foreign aid program, 22 U.S.C. §§ 2151–2443.

**27.** See remarks by Senator Hiram Johnston, *Energy Action No. 2—Small Refiners Entitlements*, Hearing on S. Res. 449 and S. Res. 450 before the Senate Committee on Interior and Insular Affairs, 94th Congress, 2d Session (1976), p. 2. *See also* 94 Cong.Rec. S8163–S8175. (1976)

made for the President to amend the exemption with the two limitations of Congressional review and the requirement that any amendment necessarily be accompanied by a finding that the statutory exemption either created unfair competition among small refiners or otherwise seriously impaired the President's ability to achieve the statutory objectives of the EPAA.

Remarks made during the floor debate on the EPCA reflect that it was only because of Congress' insecurity over how the statutory exemption itself might work, not out of a desire to establish a general review procedure over rules promulgated by the Executive, that the amending and review procedures were added. See 94 Cong.Rec. S41042, S41185, (1975). Other remarks made on the floor of the Senate make it clear that the amendment procedure was specifically intended not to change in any way the President's existing general authority to amend the small refiner bias regulations:

> Within the framework of the basic Allocation Act regulation the President, if he finds it necessary to achieve the purposes of the act, particularly the purposes of 4(b)(1)(D), has the authority to increase the entitlements allotment to small refiner sellers to eliminate competitive disadvantages. Nothing in S622 alters or diminishes this authority. 94 Cong. Rec. 12–17–75, S41185 (1975) (Remarks by Senator Jackson).

The legislative history of the EPCA thus makes it clear that Congress was doing nothing other than setting up a review procedure for a particular statutory exemption to the FEA regulations, found in § 403 of the EPCA. No mention was made of an effort to require review of other regulations promulgated in furtherance of the EPAA's objectives. This, in conjunction with a finding that Congress did not rely on the FEA's characterization of Energy Action No. 2 as a "modification" of the exemption, leads the Court to reject the plaintiffs' contention that a reduction in the small refiner bias is subject to Congressional review under § 455 of the EPCA.

The Court finds, rather, that this situation reflects the interplay between the legislative and executive functions of government often produced as a result of the delegation of rulemaking authority and the reservation of Congressional review of promulgated rules.[28] In any case, it certainly does not reflect a condition under which the reservation of a right of review can be transferred from the entitlements exemption to these changes in the small refiner bias levels. FEA had the power to change the bias levels either before, after, or in conjunction with the proposed revocation of Special Rule No. 6. Nothing has altered that power.

## IV

4. The plaintiffs' last argument involves the National Environmental Policy Act (NEPA) which under § 102(2)(C) requires, in part, that each federal agency:

> include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action . . . .

This detailed report is called an Environmental Impact Statement (EIS) and, under the terms of the statute, is required only

28. The Supreme Court recognized this relationship in *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) when it stated "While the Constitution diffuses power the better to secure liberty, it also contemplates that practices will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity . . . ". *See also* 94 Cong.Rec. S8163–S8175, H5027–H5032, (1976), for an example of how the congressional committees sought to work with FEA to achieve acceptable regulations and 41 Fed.Reg. 20392–3, May 18, 1976, for an example of how FEA was conscious of Congressional concerns.

when there is a "major Federal action significantly affecting the quality of the human environment": Ordinarily, it is the agency itself which must determine whether these three statutory prerequisites are present, and if it is required to compile an EIS under the terms of NEPA. *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

This Court is asked to review the adequacy of DOE's decision that "the proposed changes to the small refiner bias will not have any significant impact on the quality of the human environment in any respect . . . ."(Ad.Rec. Vol. X, p. 6712). The plaintiffs argue that the proposed action will "significantly" affect the quality of the human environment, and take issue with DOE's conclusion to the contrary. Plaintiffs also contend that an EIS is required if there are *arguably* significant effects and that the issuance of the Environmental Assessment (EA) by DOE was so late and superficial as to disregard the requirements of NEPA.[29] Defendant argues that the EA did adequately analyze the question of "significant" harm and that all procedural requirements were indeed met.

It should first be noted that, as stated above, it is the agency's responsibility to comply with NEPA. Agencies ordinarily make a "threshold" decision to determine whether the proposed action will meet the three NEPA requirements for the preparation of an EIS. If it is initially determined that the proposed action does meet the criteria, then an EIS is compiled. If the threshold determination is negative, then no EIS is prepared. DOE's regulations regarding this threshold determination are found at 10 C.F.R. § 208, et seq., and provide that DOE will first prepare an EA to determine whether the proposed action will be major and will significantly affect the quality of the environment. 10 C.F.R. § 208.4. In this case, DOE's EA concluded

that no EIS was required. The issue, then is whether DOE's decision is sufficient as a matter of law.

In *Maryland National Capital Park & Planning Commission v. U. S. Postal Service,* 159 U.S.App.D.C. 158, 168, 487 F.2d 1029, 1039 (1973), the Court of Appeals for the District of Columbia Circuit addressed the question of what approach should be taken to review an agency's environmental assessment where the environmental impact is identified but not thought to require the preparation of an EIS.

> We believe that an "assessment" statement must provide convincing reasons why a construction project with "arguably" potentially significant environmental impact does not require a detailed impact statement. In this sense we agree with both the majority and the dissent in *Hanley II, supra.* We agree with Judge Friendly's dissent that in cases of "true insignificance" an impact statement is not required, and, thus when there are "arguably" cases of true significance, an impact statement is required. 471 F.2d at 837. On the other hand, we can rely on a review of the record, here consisting of the "assessment" as supplemented by other submissions . . . to determine whether the agency has supplied convincing reasons why potential impacts are truly insignificant.

To help determine whether a possible impact was truly insignificant or whether it is "arguably" significant, the court formulated three questions to apply to an agency's determination: 1) did the agency identify the relevant areas of environmental concern, 2) did the agency take a hard look at the problem, as opposed to a bald conclusion unaided by preliminary investigation, and 3) did the agency make a convincing case that the impact is insignificant as to the problems studied and identified.

---

**29.** On April 4, 1979, DOE published an announcement of the availability of an Environmental Assessment. The deadline for comments from interested parties was set on April 17, 1979. Under 10 C.F.R. § 208.12(b)(3) DOE must allow a minimum of 10 days for comment after notice of availability of an EA which makes a negative determination that an EIS is not required.

 Applying this framework to the EA with particular regard to the possible environmental effects resulting from DOE's regulations designed to phase out the small refiner bias in conjunction with the entitlements program, the Court finds that the EA, as it presently stands, does not meet the requirements of NEPA.

From a review of the record in the context of the bias phase-out formula, it is clear that each of the areas of environmental concern brought to the Court's attention by the plaintiffs was not the subject of a "hard look" as it related to the effects of the bias phase-out formula. Neither the draft regulatory analysis published with the November NPRM (Ad.Rec. Vol. V, p. 2825), nor the Environmental Assessment published in April, 1979 (Ad.Rec. Vol. X, p. 6672) in any way examined the effects of the bias phase-out or the effects of any alternative to accomplishing this goal. In the Evaluation of Comments on the Environmental Assessment, published April 26, 1979 (Ad. Rec. Vol. XI, p. 7552) the only reference to the phase-out formula was as follows:

Although the final rule being issued by ERA on the bias differs somewhat from the one proposed in the November Notice of Proposed Rulemaking, this difference simply has the effect of phasing out the bias over the period of time between now and 1981 when it would expire in any event. In effect, it only removes the requirement which would arise, as noted in the Notice of Proposed Rulemaking, to adjust the bias program further as the entitlements program is phased out. This does not alter the results of the analyses in the EA that no significant environmental impacts will result from the amendments to the bias program. Id. at 7573.

The scope of the EA, however, was directed solely to possible impacts of the amendments published in the November NPRM, which as seen above, in no way included a formula designed to phase-out the bias. This is evident from the comments which the EA makes about specific areas of environmental concern which are directed only to the impact of the proposed rules. For example, with regard to the November NPRM rules impact on the refining industry in general, the EA states:

The estimated impacts of the proposed changes on various segments of the refining industry are set forth in the draft regulatory analysis dated November 15, 1978. . . . This reduction and reapportionment of the benefits would result in an average decrease in benefits from present levels for refiners with capacities below 50 MB/D and an average increase in benefits for refiners with capacities between 50 and 175 MB/D (Ad.Rec. Vol. X, p. 6679)

As regards the assessment of the impact on refiners of unleaded gasoline, the EA went through the various groups of small refiners, identified their unleaded gasoline production capacity, and then identified the level of benefits each group would be receiving. Nowhere was there an analysis of how a scale-down in bias benefits might affect these small refiners or any other small refiners over a two-year phase-out period.

Perhaps most significant is DOE's treatment of the principal environmental impacts from the proposed November NPRM rules which would arise either from an increase or decrease in refinery activity. (Ad. Rec. Vol. X, p. 6689). DOE discussed the effect of the proposed amendments and drew specific conclusions from those particular amendments. No adjustment was ever made for the changes in the final regulations.

The amendments now proposed by DOE would, in effect, return benefit levels for small refiners to approximately the same order of magnitude as was in effect from the initiation of the program until its sizeable increase in March of 1976 . . . The continuity and stability of small refining operations under 50 MB/D prior to March 1976 is evidence that the benefit levels in effect at that time were, at the least, sufficient to support the viability of those small refining operations which existed at the commencement of the pro-

gram, and could have been in excess of actual operating margin differentials between large and small refiners. (Ad.Rec. Vol. X, p. 6693).

The real question which was ignored is whether under the May regulations formula the benefit levels would be sufficient to support the small refiners' viability and whether any consequences would flow therefrom. This gap is also reflected in the agency's conclusions regarding the effect of the *proposed* regulations on refinery activity in general:

> Given the record of small refiner stability during the November 1974—March 1976 period when benefit levels were significantly lower than current levels, and given the documentation of the Gordian analysis supporting the adequacy of a reduced benefit level, DOE does not believe that the *proposed action* would cause any significant increase or decrease in the refinery activity of those refiners under the 50 MB/D which have been in operation since the initiation of the program. (Ad.Rec. Vol. X, p. 6694) (Emphasis added.)

Similar analyses for the effects on air quality, water quality, noise and land use were all based on the effects of the November NPRM proposed rules. As for any socioeconomic impacts, DOE's analysis was that:

> . . . any negative impacts of the *proposed action* sufficient to cause closedowns of small refineries, and thus production losses, can be expected to be confined almost entirely to those refineries which have come into existence during the course of the bias program. (Ad.Rec. Vol. X, p. 6700) (Emphasis added.)

The limitations, and in this situation the fatal defect, of the EA can be seen in its conclusion concerning the significant impact which the regulations as *proposed*, and not as finalized, would have:

> The *proposed changes* to the small refiner bias will not have any significant impact on the quality of the human environment in any respect . . . .. (Ad.Rec. Vol. X, p. 6712) (Emphasis added)

The formula to phase-out the entitlements program obviously goes deeper than a mere "further adjustment" of the bias levels. It should be clear that DOE did not simply substitute the flexible for the fixed dollar formulas in this regard. Rather, DOE substituted a flexible bias for a fixed bias *designed to eventually eliminate that bias.* Any issue which involves the ultimate elimination of the program fundamentally changes the structure of the benefits in a way completely different from that proposed in the November notice. No assessment of how this change would affect the environment was made beyond the statement that "This does not alter the results of the analyses in the EA that no significant environmental impact will result from the amendments to the bias program." (Ad. Rec. Vol. XI, p. 7572) The proceedings involved with this issue, however, do not show that DOE based this conclusion on an investigation as to the effects of the phaseout, nor do they reflect that the agency engaged in a substantial inquiry into the facts that was both "searching and careful". *Greater Boston Television Corp. v. Federal Communications Commission, supra,* 143 U.S.App.D.C. at 392–394, 444 F.2d at 850–853.

The fact that no comments were received by the agency in response to the publication of the EA perhaps reflects the fact that interested parties had no notice from the EA that this phase-out formula was to be included in the final rule. What few comments were sent in prior to the EA's publication concerned only the general subject matter notice published in the November NPRM and raise some questions of hardship and the necessity for other replacement programs if phase-out were to occur. (See Ad.Rec. Vol. V, pp. 3613, 3601; Vol. VI, pp. 3863, 4230; Vol. VII, p. 4607) Neither of these issues was subsequently addressed by DOE.

 The importance of adequate reasons to support an agency's conclusions that an EIS is not necessary was underscored in *Scientists' Institute for Public Information v. Atomic Energy Commission,*

156 U.S.App.D.C. 395, 411, 481 F.2d 1079, 1095 (1973):

> A statement of reasons will serve two functions. It will ensure that the agency has given adequate consideration to the problem and that it understood the statutory standard. In addition, it will provide a focal point for judicial review of the agency's decision, giving the court the benefit of the agency's expertise.

Here, the Court cannot accept DOE's conclusory statement that the particular phase-out formula chosen will not cause the May regulations to significantly affect the quality of the human environment. On the basis of the present record, DOE's conclusion is clearly unreasonable as well as arbitrary and capricious. The Court is not finding that this conclusion can never ultimately be proven correct, but until the Court can be assured that the issue has been studied, debated, and that it has been supported by an adequate statement of reasons, the requirements of NEPA have not been met.

## V

A different conclusion must be reached, however, regarding DOE's compliance with NEPA relating to the impact study made of the November NPRM amendments. Here, the Court finds that the agency's decision not to file an EIS with regard to these amendments was neither unreasonable nor arbitrary and capricious. Therefore, to the extent that the May regulations adopted the amendments proposed in the November NPRM, the plaintiffs' arguments must be rejected.

First, that the agency did take a "hard look" at the possible impacts is abundantly reflected by the record. When the text of the proposed amendments was first published in the Federal Register on November 22, 1978, they were accompanied by a draft regulatory analysis which set forth the objectives and justification for the proposed rule changes and which qualified and described the expected impacts of the proposed modifications. Part of that impact study was to look at how the refining companies themselves would be affected. A similar analysis of product prices and possible alternatives was also made. Comments were invited on these subjects.

The Environmental Assessment itself evaluated these comments and drew reasoned detailed conclusions with regard to specific environmental concerns. The areas of water quality, noise and land use were examined. With regard to air quality, the EA examined the possibility of a reduction in the production of unleaded gasoline and on the basis of statistics concluded that those refiners likely to be impacted by the proposed regulations account for only .3% of unleaded gas shipments. (Ad.Rec. Vol. X, p. 6696) As for socioeconomic effects, the EA concluded with a statement of reasons that there would be little or no effect on the supply and price of gasoline resulting from the proposed bias levels although no assessment was made on possible unemployment resulting therefrom.

Perhaps the most important part of the EA concerned a review of the effect the proposed bias levels would have on future refinery expansion and any resulting increases or decreases of refining activity. Again the EA had reasons supporting its conclusions that if anyone were to be affected it would be refineries accounting for 1.5% of the total domestic refining capacity and that the amount of oil actually affected would be too small to be significant. (Ad. Rec. Vol. X, pp. 6689–6695)

In response to the demand for comments on the EA, 17 different comments were submitted by 16 individuals, including 7 comments from major and large independent refiners, 6 small refiners, two trade associations representing small refiners, two from the Environmental Protection Agency and the South Coast Air Quality Management District of California. Two of the named plaintiffs in this action, Mt. Airy Refining Company and Peerless Petrochemicals, Inc. submitted comments which reflected the same environmental concerns which have been raised in the instant action. The plaintiffs' comments first challenged the accuracy of DOE's assessment that the proposed regulations would not·

cause any significant increase or decrease in the refinery activity of refiners of a certain size who had been in operation since the initiation of the small refiner bias program. The plaintiffs mentioned that their "particular concern" was the environmental and economic impact in light of "reduction in Iranian imports, related OPEC increases, and President Carter's recent action to decontrol crude oil". (Ad.Rec. Vol. X, p. 6726) Plaintiffs argued that the Gordian report did not anticipate the Iranian Oil shortage and that this in combination with the other factors would cause widespread shutdowns of small refiners.

Plaintiffs brought three more points of contention to the agency's attention. First, the EA was said to fail to consider the "impact on the available supply of low sulphur residual fuel oil to meet domestic needs". (Ad.Rec. Vol. X, p. 6728) Second, a reassessment was called for "after thorough analysis of the impact of crude oil decontrol upon the refining industry as a whole and upon the small refining segment in particular". (Ad.Rec. Vol. X, p. 6727) Last, plaintiffs argued that air pollution caused by increased refining activity by larger refiners to make up the loss of some small refiner capacity would take place in heavily populated areas and that this would increase present levels of air pollution.

■■■■ Each of these concerns was responded to by the agency in its Evaluation of Comments (Ad.Rec. Vol. XI, p. 7552) with rational arguments supporting DOE's conclusions. It is not up to the Court to determine whether it agrees with the agency's final conclusions. Rather, under the arbitrary and capricious standard, the agency's decision must be upheld if a rational basis exists for it. *Ethyl Corp. v. Environmental Protection Agency, supra,* 176 U.S. App.D.C. at 409, 541 F.2d at 27. This record reflects that with regard to the rules proposed in the November NPRM, the agency did focus on the significant environmental problems and did take a hard look at the environmental problems involving the proposed rules.

VI

## II. Irreparable Harm

The second criteria set forth in *Virginia Petroleum Jobbers* is whether the plaintiffs have shown that without the requested relief they will suffer irreparable harm. In this regard, the Court is cognizant of the importance of the small refiner bias within the economic structure of the federal government's regulation of the petroleum industry. This is partially reflected in the Gordian Report:

> At the time the (entitlements) program was initiated, FEA concluded that small refiners needed more than equalized crude cost, that they needed additional assistance as well to remain competitive. (Ad.Rec. Vol. I, p. 31 see also Vol. V, p. 2816)

■■■■■ If it were solely a question of alleged economic injury as a result of the reductions in the bias as proposed in the November NPRM, the question of severe economic impact as a justification for injunctive relief would be in doubt. The May regulations, however, adopted a formula where the bias levels are set to proportionately decrease as the price of crude oil is decontrolled, and as noted above, while DOE assessed the economic impact of the proposed regulations, it did not adequately do so with regard to the formula designed to phase out the bias in direct proportion to oil decontrol. Although plaintiffs argue that such a loss of benefits would not permit them to compete and would deny them their financial base to operate, the Court has not been presented with sufficient evidence to establish that this result will necessarily occur. On the basis of the evidence presented to the Court, any decision to stop refining activities would seem to rest on the willingness, not the economic ability, of the entrepreneur to continue. This situation is not, therefore, similar to *Armour and Company v. Freeman,* 113 U.S.App.D.C. 37, 304 F.2d 404 (1962), cert. denied 370 U.S. 920, 82 S.Ct. 1559, 8 L.Ed.2d 500 (1962), cited to the Court by the plaintiffs, where Armour only had two choices of either withdrawing its

product from the market or damaging its good name. There is no such forced result here, and an otherwise valid regulation will not be enjoined on the grounds that one segment of the regulated class suffers economic loss not shared by other members of the class. *Bowles v. Willingham*, 321 U.S. 503, 518–519, 64 S.Ct. 641, 88 L.Ed. 892 (1943); *Air Transport Association of America v. Federal Energy Office*, 382 F.Supp. 437 (DCDC 1974).

A clear basis for irreparable harm, however, does result from DOE's failure to conform to the procedural requirements of NEPA. In *Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App. D.C. 366, 376–371, 499 F.2d 502, 512–513 (1974), the court addressed the role of injunctive relief in a similar situation with regard to irreparable injury:

> The purpose of equitable intervention, in cases in which federal agencies have failed to comply with NEPA's requirements is to ensure that such compliance will take place before there has been an 'irretrievable commitment of resources'. It may be that preparation of the statement will, in the end, not move the agency from adherence to decision it has already made. But it is not for the courts to prejudge. So long as the *status quo* is maintained, so long as the environmental impact statement is not merely a justification for a *fait accompli*, there is a possibility that the statement will lead the agency to change its plans in ways of benefit to the environment. It is this possibility that the courts should seek to preserve.

Despite the fact that the instant case involves the preparation of a proper environmental assessment and not the completion of a full EIS, without injunctive relief the May regulations will start to have their intended effect and this effect will take place without the benefit of a proper environmental assessment.

## VII

### III. Harm to Other Parties

In *Virginia Petroleum Jobbers, supra,* the court noted that despite affirmative findings in the above two categories, courts should be hesitant to issue an injunction if such actions would have a harmful effect on other persons. "Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents". 104 U.S.App.D.C. at 110, 259 F.2d at 925.

A stay of the May regulations with regard to the phasing out of the small refiner bias would ultimately have the effect of increasing the proportion of the bias benefits until they are equal to the whole entitlements pool, thereby reducing the benefits available to other entitlements participants. While this might seem unfair to the other participants in the entitlements pool, it is remediable by further rulemaking proceedings before this effect actually takes place. See Final Regulatory Analysis of the Small Refiner Bias Amendments, pp. 5–8.

On the other hand, permitting all other aspects of the May regulations to take effect would cause no particular harm to other parties which would necessitate the Court to exercise its equitable jurisdiction to enjoin those rules in addition to those designed to phase-out the bias.

## VIII

### IV. The Public Interest

The court in *Virginia Petroleum Jobbers, supra,* held that the public interest was a crucial factor where the administration of regulatory statutes designed to promote the public interest was in question. "The interests of private litigants must give way to the realization of public purposes". 104 U.S.App.D.C. at 110, 259 F.2d at 925.

With regard to the proper adoption of regulations to phase out the bias, the interests of the plaintiffs are more closely associated with the public interest than is the government's asserted stake in preserving the integrity of its regulatory programs. Congress set out the public interest in NEPA, in the procedural requirements of

the DOE Act, and in the objectives of the EPAA. In granting injunctive relief only with regard to that part of the May regulations which were adopted in contravention of these acts, the Court is ensuring that the public interest which they were designed to protect is indeed being protected according to the law. If the procedural requirements of these acts have been met, however, and if DOE has made the determination lawfully delegated to it in a lawful manner of where the public interest lies, the Court should respect those determinations. With regard to all other aspects of the May regulations, then, the Court finds that the public interest is best served by allowing them to take effect.

## IX

### CONCLUSION

The analysis of the plaintiffs' motion for a preliminary injunction can best be approached by dividing the disputed May regulations into two parts. The first part deals with the regulations which were previously published in the November NPRM, subject to public comment and assessed under the requirements of NEPA. With regard to this part of the amendments, the Court finds that they were not arbitrary and capricious and did meet the applicable procedural requirements, including the requirements of NEPA. Despite the lack of a showing of success on the merits, injunctive relief might still be proper if the other three *Virginia Petroleum Jobbers* criteria tilt the balance of equities in favor of injunctive relief. See *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., supra,* 182 U.S.App.D.C. at 223, 559 F.2d at 844. However, after assessing the four applicable factors, the Court concludes that injunctive relief should not issue to enjoin the implementation of that part of the May regulations which were properly promulgated.

The May regulations also include one formula, however which is designed to phase out the small refiner bias in conjunction with the gradual decontrol of crude oil prices. Here the plaintiffs have demon-

strated success on the merits, and the other three factors indicate that injunctive relief is appropriate.

### ORDER

Based on the Administrative Record before the Court the briefs of both parties, their oral argument, and the above discussion of the Findings of Fact and Conclusions of Law, the Court this 20th day of August, 1979, hereby

ORDERS:

1. The Secretary of Energy, the Administrator of the Department of Energy's Economic Regulatory Administration, and all other officials of the Department of Energy are hereby enjoined from enforcing or applying 10 C.F.R. § 211.67(e)(4) published at 44 Federal Register 25627, May 2, 1979, to the calculation of all benefits or rights accruing to the individual named plaintiffs herein under the Department of Energy's "Entitlements Program" found in 10 C.F.R. § 211.67, until that section is found to comply with all applicable law and necessary procedures.

2. The defendant's motion for summary judgment is hereby granted in all other respects.

3. The plaintiffs' cross-motion for summary judgment is hereby denied in all other respects.